**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| AMIGOS LABOR SOLUTIONS, INC., LABOR CONSULTANTS INTERNATIONAL, CO. LTD., MAS LABOR H2B, LLC and VTB SOLUTIONS, INC. D/B/A PRACTICAL EMPLOYEE SOLUTIONS, | § § § § § § § | |
| Plaintiffs, | § | |
| vs. | § § | Civil Action No. _____ |
| THOMAS E. PEREZ, in his official capacity as United States Secretary of Labor, WILLIAM THOMPSON, in his official capacity as acting Administrator, Office of Foreign Labor Certification, Employment and Training Administration, United States Department of Labor, BRIAN PASTERNAK in his official capacity as Deputy Administrator, Office of Foreign Labor Certification, Employment and Training Administration, United States Department of Labor, UNITED STATES DEPARTMENT OF LABOR as a Party, JEH C. JOHNSON, in his official capacity as Secretary of the Department of Homeland Security, LEON RODRIGUEZ, in his official capacity as Director of the United States Citizenship and Immigration Services, DONALD NEWFELD, in his official capacity as Associate Director Service Center Operations Directorate of the USCIS, LAURA ZUCHOWSKI, in her official capacity as Director of the USCIS Vermont Service Center, KATHY A. BARAN, in her official capacity as Director of the USCIS California Service Center and the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

**COMPLAINT FOR INJUNCTIVE AND DECLATORY RELIEF
AND PETITION FOR ISSUANCE OF WRIT OF MANDAMUS - Page 1**

**COMPLAINT FOR INJUNCTIVE AND DECLATORY RELIEF
AND PETITION FOR ISSUANCE OF WRIT OF MANDAMUS**

Plaintiffs, AMIGOS LABOR SOLUTIONS, INC. ("AMIGOS"), LABOR CONSULTANTS INTERNATIONAL, CO. LTD. ("LCI"), MAS LABOR H2B, LLC ("MAS LABOR") and VTB SOLUTIONS, INC. D/B/A PRACTICAL EMPLOYEE SOLUTIONS ("PES") hereby bring this Complaint against Defendants THOMAS E. PEREZ, in his official capacity as United States Secretary of the Department of Labor (DOL), WILLIAM THOMPSON, in his official capacity as Acting Administrator, Office of Foreign Labor Certification (OFLC), Employment and Training Administration (ETA), BRIAN PASTERNAK in his official capacity as Deputy Administrator, OFLC, ETA, DOL, the UNITED STATES DEPARTMENT of LABOR as a Party, JEH C. JOHNSON, in his official capacity as Secretary of the Department of Homeland Security (DHS), LEON RODRIGUEZ, in his official capacity as Director of the United States Citizenship and Immigration Services (USCIS), DONALD NEWFELD, in his official capacity as Associate Director Service Center Operations Directorate of the USCIS, LAURA ZUCHOWSKI, in her official capacity as Director of the USCIS Vermont Service Center, KATHY A. BARAN, in her official capacity as Director of the USCIS California Service Center and the UNITED STATES DEPARTMENT of HOMELAND SECURITY[1] alleging:

**INTRODUCTION**

1.      As set forth below, Plaintiffs are aggrieved by the failures of the Defendants and their officials, including those Defendants named in their official capacities, to follow the governing statute at 8 U.S.C. § 1101(a)(15)(H)(ii)(b) under which U.S. employers that require

---

[1] The U.S.C.IS is a component agency of the DHS.  OFLC is a component agency of DOL.  When references are made to DHS and DOL, the allegations are made also against the named officials of the respective agencies in their official capacities.

**COMPLAINT FOR INJUNCTIVE AND DECLATORY RELIEF
AND PETITION FOR ISSUANCE OF WRIT OF MANDAMUS - Page 2**

foreign "temporary" guestworkers to fill seasonal or other temporary jobs in nonagricultural positions are entitled, applicable requirements being met, to bring such temporary foreign guestworkers to the United States to fill those temporary positions at the time they are needed and under conditions that allow the employers to operate their businesses successfully and meet their obligations to their customers in a timely and complete manner.   Excuses that the Defendants lack funding or adequate staffing to conduct their statutory duties in a timely way cannot preclude employers from obtaining the services of guestworkers on whose services they and their U.S. employees and customers rely.   Excuses that they do not have time to comply with Congressional mandates likewise are not adequate reasons to deny employers the rights they are afforded under law.   Moreover, the DHS Defendants and their subordinate staffs charged with implementing what is known as the H-2B Program, based on the statutory subpart of Title 8, that is cited above and that is applicable to the program, have failed to follow the DHS regulations issued for the operation of the USCIS that are published at 8 C.F.R. § 214.2(h)(6), having been promulgated at 73 Fed. Reg. 78,104 (Dec. 19, 2008).   They have effectively and materially changed the operational requirements and burdens under those regulations on employers and their agents, including Plaintiffs here, without lawful rulemaking under notice and comment procedures as required by 5U.S.C. § 553.   DHS Defendants have not timely adjudicated or approved Form I-129 *Petitions for Nonimmigrant Workers* ("petitions") for H-2B workers that were filed by the Plaintiffs as Agents on behalf of H-2B employers who need assistance in completing the filing with the three (3) federal agencies that are required in order for an employer to be allowed to bring H-2B temporary foreign guestworkers to the United States to perform necessary work as lawfully employed temporary workers.   The DOL Defendants and its subordinate officials and staff charged with implementing the H-2B Program have likewise

failed to follow the requirements of the same governing statute. All Defendants have failed to follow regulations issued jointly with DHS by Federal Register Notice at 80 Fed. Reg. 24,042-24,144 (April 29, 2015 to be codified at 20 C.F.R. § 655.1 through 655.99) ("Joint DHS/DOL H-2B Regulations"). The Plaintiffs and the H-2B employers they represent have no adequate administrative appeal route before either agency or any other tribunal to avoid catastrophic and irreparable ruin. Resort to any additional agency or appellate administrative processes would be futile. They therefore seek the immediate assistance of this Honorable Court as H-2 dependent employers have been forced seek the intervention of the Federal Courts in the past.

2.      Under 8 U.S.C. § 1101(a)(15)(H)(ii)(b), the statutory provision that establishes and governs the H-2B program, along with 8 U.S.C. § 1184(c), a temporary, nonagricultural worker such as the temporary workers Plaintiffs and their employer clients need is one who:

> having a residence in a foreign country which he has no intention of abandoning, who is coming temporarily to the United States to perform other temporary service or labor [that is not agricultural service as provided in subpart H(ii)(a)] if unemployed persons capable of performing such service or labor cannot be found in this country . . ..

3.      Under DHS regulations under which USCIS examines H-2B petitions in accordance with 8 C.F.R. § 214.2(h)(6)(vi)(D) the employer must provide "[a] statement describing in detail the temporary situation or conditions which make it necessary to bring the alien to the United States and whether the need is one-time occurrence, seasonal, peakload, or intermittent. If the need is seasonal, peakload, or intermittent, the statement shall indicate whether the situation or conditions are expected to be recurrent . . ."

4.      The DHS definition of "*temporary services or labor*" is stated at 8 C.F.R. § 214.2(h)(6)(ii)(A) as follows:

> Temporary services or labor under the H-2B classification refers to any job in which the petitioner's need for the duties to be

performed by the employee(s) is temporary, whether or not the
underlying job can be described as permanent or temporary.

5.      According to these DHS regulations adopted in 2008, the "Nature of petitioner's

need" that is appropriate for H-2B eligibility is described as follows:

Employment is of a temporary nature when the employer needs a
worker for a limited period of time. The employer must establish
that the need for the employee will end in the near, definable
future. Generally, that period of time will be limited to one year or
less, but in the case of a one-time event could last up to 3 years.
The petitioner's need for the services or labor shall be a one-time
occurrence, a seasonal need, a peak load need, or an intermittent
need.

8 C.F.R. § 214.2(h)(6)(ii)(B).

6.      The so called "*one-term time occurrence*" basis for H-2B certification and visa

authorization is designed to meet the needs of employers that need, for example, to staff a large

construction project or other one-time project over a defined limited period of time but a period

of time that may last up to three years.  *See* 8 C.F.R. § 214.2(h)(6)(ii)(B)(1).

7.      The employers whose Agents are Plaintiffs in this suit are not employers who

need workers on an "intermittent" basis over a short period of time as permitted under 8 C.F.R.

§ 214.2(h)(6)(ii)(B)(4).

8.      The two DHS/USCIS definitional categories of "temporary" needs that best

describe the needs of most of the employers represented by Plaintiff Agents here are the so-

called "*seasonal need*" and the "*peakload need*" employers. These two terms are defined by

DHS/USCIS regulation as follows:

(2) *Seasonal need.* The petitioner must establish that the services
or labor is traditionally tied to a season of the year by an event or
pattern and is of a recurring nature. The petitioner shall specify the
period(s) of time during each year in which it does not need the
services or labor. The employment is not seasonal if the period
during which the services or labor is not needed is unpredictable or
subject to change or is considered a vacation period for the
petitioner's permanent employees.

> (3) *Peakload need.* The petitioner must establish that it regularly employs permanent workers to perform the services or labor at the place of employment and that it needs to supplement its permanent staff at the place of employment *on a temporary basis due to a seasonal or short-term demand* and that the temporary additions to staff will not become a part of the petitioner's regular operation.

8 C.F.R. § 214.2(h)(6)(ii)(B)(2) and (3) (emphasis supplied).  In all cases, Plaintiffs' employer clients have shown that their annual temporary employees do not become a part of the regular year round operations. They are needed only for a period of months within a 12 month recurring cycle.

9.       As the DHS/USCIS regulatory definitions for "*seasonal need*" and "*peakload need*" show, a "peakload need" can be the result of a temporary need to supplement the existing permanent staff at the place of employment "due to a *seasonal or* short-term demand. . . ." (Emphasis supplied).  Some H-2B landscape, resort and hotel employers and others have only a "seasonal need," *i.e.*, one that is governed by the four seasons of the year. During the coldest, deepest days of winter, for example, as in the cases of some landscape operators, northern beach resorts, and golf courses, they do not operate at all.  Such landscape companies do not need any workers who work with outdoor plant materials, as they do in the warmer months, generally beginning in mid-February to begin cleanup work as winter is abating and continuing through the fall to prepare plants to survive the winter by adding mulch and taking other steps to enable the operations to shut down fully for a defined, seasonally-related period.  Other H-2B employers, including some landscapers and others, maintain a smaller permanent year-round cadre of workers who during the winter season perform some of the same work as performed by their larger workforce that substantially expands in the spring because of an expansion in workload. Their peakload lasts for a period of time during each year, and their *peakload* is seasonally-related.

10.     Both the DOL Defendants' delays and failures to process H-2B applications in the time periods required under regulations and issue labor certifications that the terms and conditions of employment they offer to U.S. workers they attempt to recruit, as well as to H-2B workers, to the extent that U.S. workers cannot be found, do not adversely affect the wages and working conditions of U.S. workers similarly employed and the DHS/USCIS Defendants' delays and failures to adjudicate and timely approve petitions filed on behalf of U.S. employers by these Plaintiffs are violations of the Immigration and Nationality Act of 1952 (INA), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), the applicable DHS regulations, the April 29, 2015, published joint regulations of the DOL and DHS, the Administrative Procedure Act, and the Fifth Amendment to the Constitution of the United States.  Their actions and their failures to act are resulting in current, ongoing and serious and irreparable injuries to Plaintiffs in their businesses as agents of H-2B employers and to their employees as well as to their client employers and their U.S. workers.  Many such employer clients of the Plaintiffs have needed to be able to employ H-2B temporary foreign guestworkers earlier this year, as early as January or February, and they now badly need the services of these H-2B workers whose services they have been unlawfully denied.  Most other H-2B employers need their workers on April 1, 2016, but they have no hope of receiving their needed workers by April 1, given remaining processes and approvals that the agencies have yet to perform and the unlawful conditions these agencies have attempted to impose on them, contrary to law and the agencies own regulations. The acts and omissions of the Defendants have already caused irreparable ongoing damages to the Plaintiffs and have already caused ongoing irreparable damages to the clients of all of these individuals and businesses and indeed the U.S. economy in general and these injuries are continuing.

11.     Plaintiffs will separately file a motion requesting that the Court commence an emergency hearing on this matter as soon as papers and briefing can be completed. Time is of the essence because the Defendants' failures to act upon pending and long-overdue-for-action applications for certification filed with DOL and the DHS Defendants' failures to adjudicate and approve pending H-2B Employers' petitions have prevented Plaintiffs' employer clients from having some 14,300 H-2B workers on the job on time, thus preventing the Plaintiff Agents from fulfilling their duties and their H-2B employer clients from fulfilling seasonally-dependent, time-sensitive contractual obligations and other temporary work that must begin on time to be completed within the available time their seasonal businesses can operate and earn revenue for their "year" and jeopardizing the jobs of U.S. workers whose own employment is dependent on the H-2B workers' arrival to perform their jobs. Even after completion of certification processes operated through DOL and adjudication of these petitions by DHS adjudicators, these Plaintiff Agents and their H-2B employer clients must still apply for and obtain appointments at Consulates of the United States Department of State (DOS) in Mexico, Jamaica and other home countries of the proposed H-2B workers so Consular officials can investigate, interview and finally determine whether or not individual proposed H-2B employees, who also must submit their own DS-160 applications to DOS officials, meet requirements for admission into the United States. It can take 10 days to schedule a Consular interview and get the workers from their home villages to the Consular city once USCIS issues its approval of visa issuances. When the Consular officials do issue a visa to an individual H-2B worker, the fact that the individual has been issued an H-2B visa is recorded in the Federal computer database, and USCIS thereafter has access to that individual record.

12.     Because of additional mandatory and time consuming procedures that must be completed before U.S. Consular officials in Mexico, Jamaica and the workers' other home countries can even be scheduled to meet with the proposed H-2B visa grantees and because of the practical logistical problems of transporting large numbers of H-2B workers from their home countries to a consulate and then to their worksites within the United States from Washington State, to Texas, Florida, Virginia, New York, and beyond, even after USCIS finally approves the overdue petitions, time is of the essence. At best, once USCIS grants its approval of an H-2B employer's petition, it will take several weeks for approved workers to present themselves for interview as scheduled in advance at a designated Consulate in Mexico, Jamaica or elsewhere, receive a visa issued on the second or third or even fourth day and after an even longer delay in some countries after their appearance for an interview and travel to the worksite of their respective job locations.

13.     Both USCIS and DOL have publicly acknowledged that they have failed to meet established time limits within which they should have acted and resolved pending applications with OFLC and petitions for adjudication pending with USCIS. See the attached Exhibits 1-11 showing delays affecting the client employers of just these four (4) agent companies and composite Exhibit 12, pages 1-261.

14.     In the recent past, USCIS typically took just fifteen (15) days to adjudicate and approve a petition, based on historical experiences of these Plaintiff Agent companies whose owner/executives  who have together successfully filed thousands of such petitions over at least over 18-30 years each.   Recently, however, USCIS has unreasonably delayed actions on petitions.  In some cases USCIS has even delayed issuing receipts that are supposed to establish filing dates of petitions to as many as 2-3 and even 4 days after actual delivery on verified dates

by Federal Express. USCIS officials have refused to adjudicate and approve some petitions for more than 45-60 days even after the employers paid $1225 per petition for so-called "premium processing of their petitions.    USCIS has issued Requests for Evidence demanding that landscaping companies in Ohio, Missouri and other cold weather climates that experience cold winters, where snow and ice prevents grass from growing and trees are dormant during the coldest winter months, typically from mid-November through at least mid-February, prove that their "temporary" need for individuals to install annual bedding plants, mow grass, trim growing shrubbery and similar work meets the definition of "temporary" "seasonal" or "temporary" peakload employment under applicable regulations.   These RFEs are suddenly being issued this season even though in many cases both USCIS and DOL have previously conducted audits to determine if these same businesses met applicable requirements and were operating in compliance with applicable rules.   Many of the businesses receiving such Requests for Evidence have operated as businesses that require temporary workers on a seasonal or other temporary basis for 10 to 20 years and more.

15.    Moreover, in every case—that is each and every case that reaches the desk of an UCIS adjudicator—the same regulatory definitions of these terms has already been applied this year to the petition of that employer by an OFLC Certifying Officer before the labor certification was issued by DOL's OFLC Certifying Officer.   Joint DHS/DOL H-2B Regulations, 80 Fed. Reg. at 24,113, to be codified at 20 C.F.R. 655.6(b). The actions by USCIS adjudicators in demanding more evidence or different evidence to make the same factual showing is at best redundant but is even more unreasonable and an abuse of any discretion they possess in light of the devastating consequences of the delays they have caused and are still causing.   Moreover, DHS is allowing its adjudicators to do exactly what DHS said it would not do when it adopted

the currently effective DHS regulations under which it will determine if it will approve visa issuances on December 19, 2018. 73 Fed. Reg. 78,104, 78115. There DHS said:

> While DHS will not go into the merits of the determination previously made by DOL, DHS is responsible for ensuring the integrity of the H-2B program, that the facts presented in the entire petition package are true and verifiable. Where it is established on notice and the opportunity to respond, that the statement of facts contained in the petition or the application for a temporary labor certification was inaccurate, fraudulent, or misrepresented, DHS acts completely within its authority to deny or revoke a petition.

Id. 73 Fed. Reg. at 78,115 (middle column). Instead of accepting DOL/OFLC as having made an appropriate "merits" determination, the volume and percentages of DHS/\USCIS Requests for Evidence and Notices of Intent to Deny compared to past years suggest a wholesale policy change at that agency, contrary to its announced reliance on DOL/OFLC to do its job, and that either untrained adjudicators are being allowed to make demands and issue edits that are contrary to law and to DHS/USCIS's specifically announced views on such matters as expecting that many peakload need and seasonal need employers will require H-2B staffing on a recurring annual basis (and issuing visa approvals accordingly, year after year) or that more senior officials and the Department of Homeland Security and OFLC themselves have abandoned their stated policy of accepting DOL/OFLC determinations on matters on which DOL/OFLC has issued a determination and have abandoned the definitions of "temporary" to which both DOL/OFLC and DHS/USCIS officially subscribe. Mas Labor reports that beginning in January 2016, timely issuance of Notices of Acceptance and Notices of Deficiency at DOL was abruptly halted. Of the 35 filings in January and February, only 2 such notices (6%) were issued within the required seven (7) day period. Further, 38% of notices were issued as Notices of Deficiency. Less than half of all labor certifications issued in January were received 30 days or more from the start date of need, which is statutorily required, with the average being issued 26.8 days from

the date of need. In February, however, the average dropped to 17.6 days before the start date of

need. Only 5% of labor certifications were issued on time, outside of the 30 day window.  That

means that 95% of the labor certifications were issued late—and very late at that. The same

percentage of labor certifications was issued *after* the employer's beginning date of need. The

catastrophic failures continue today, where the average labor certification is issued just 7.4 days

from the employer's start date.  Turning to the USCIS, virtually all Mas Labor client pay the

extra $1225 per petition "premium processing" fee because timing is always tight between

USDOL/OFLC certification and the employer's date of need. At USCIS this year, the average

number of days from visa petition filing to approval has escalated from 17.4 days on average in

January to 38.6 days on average in March. In the last six months, a mere 1% of visa petitions

were approved inside of 7 days. Relative to the employer's dates of need, only 26% of visa

petitions were approved *before* the employer's needed start date; the vast majority were

approved *after* the beginning of the employer's date of need.  Petition approval has plummeted

from an average of 8.4 days until the starting date of need in January to *17 days after* the starting

date of need in March. Of the 25 cases currently pending at USCIS for Mas Labor clients, all but

3 have received Requests for Evidence ("RFE") requiring supporting documentation for their

peakload/seasonal need.  Of these 22 RFEs issued, for certain 21 were issued to Mas Labor

clients that have previously used the H-2B to fill their temporary seasonal or temporary peakload

workforce needs, and Mas Labor understands that its new client that is number 22 of the

companies receiving such an RFE is also a repeat user of the H-2B program to meet its

temporary workforce needs when and to the extent that U.S. workers are not available.  Of the

cases for which Mas Labor clients have received RFEs, 68% received the RFE within 2 weeks of

the start date of need, and in 2 such cases, the companies received an RFE *after* their starting

date of need.  In a Request for Evidence received on March 22, 2016, in connection with a petition filing that was for a seasonal landscape employer that is a multi-year certified and authorized user of the H-2B program whose petition was submitted with the employer's State quarterly wage reports and a summarized payroll report, the USCIS Vermont Service Center issued an RFE anyway.   On the last page of the RFE, under "Recruiter/Recruitment Fees," the adjudicator questions whether the employer has an agreement in place with its agent (in this case, MAS Labor) showing that the employer has prohibited the payment of prohibited fees by workers.  Such agreements are now *required as part of the employer's H-2B application to the DOL*.  DOL would not be issuing a labor certification to this employer or to any employer that has not already furnished such documentation to DOL/O"FLC.   The *issuance of the labor certification itself by DOL/OFLC should stand as confirmation that such an agreement between the employer and its agent, one of the Plaintiffs in this suit, is in place*.  Why, in the face of its regulatory commitments not to second guess DOL/OFLC would an USCIS adjudicator usurp that responsibility from DOL/OFLC  and ask again for a document that was required as part of the DOL/OFLC application package? Also, it is worth noting that this section of the RFE contains multiple errors and contradictions.  The City of Tegucigalpa is in Honduras, not Guatemala as the RFE says. The RFE refers to Monterrey, Mexico in one place and Nuevo Laredo, Mexico in another (Monterrey is correct, Nuevo Laredo is not).  It also says that the employer has answered in the affirmative concerning whether it will use a recruiting or similar placement service to locate the workers, but further down it says, "please explain to USCIS how you plan to recruit and hire 20 unnamed workers from Nuevo Laredo, Mexico if you will <u>not</u> be utilizing any type of placement service."  The DHS, USCIS and the senior officials of the agencies are already on

notice of the errors of its adjudicators, and they have done nothing to curtail the issuances of Requests for Evidence like this just received on March 22, 2016.

16.     OFLC has repeatedly issued Requests for Evidence from the Plaintiff Agents and their respective employer clients to establish that the employers' needs for workers are "temporary," despite the express adoption of the DHS/USCIS definition of this and related terms at 80 Fed. Reg.at 24,113, to be codified at  20 C.F.R. 655.6(b) and acknowledgements by both DHS and DOL on many occasions that "temporary work refers to *any job where the employer's' need* for the employee is *temporary*, regardless of whether the underlying job can be described as permanent or temporary.  *In re Artee*, 18 I & N. Dec. 366-367 (1982) (Emphasis supplied).  "It is not the nature or the duties of the position which must be examined to determine the temporary need.   It is the nature of the need of the duties to be performed which determines the temporariness of the position." *Id.* at 367.

17.     Under DOL/OFLC regulations, OFLC must determine whether an application for H-2B employment meets applicable requirements within seven (7) business days of the receipt of such application and must provide Notice to the applicant employer and its agent by means of next-day delivery of any modifications required if the original application is deficient in some way.   OFLC has failed to meet these deadlines even after having said that it has adopted "Emergency Procedures" to expedite the processing of long-delayed, overdue applications.  *See* pp. 156-157, 170-173 to Exhibit 12.   Nonetheless, OFLC appears also to be routinely issuing notices of supposedly required modifications that in fact are not legally required. Issuing a Request for Modification within seven (7) business days does however, makes it appear that OFLC has taken action, albeit not proper action or one that is lawful, on an application within seven (7) days.

18.     Besides the foregoing general descriptions of the errors and omissions of the Defendants, they have issued requirements in violation of the Consolidated Appropriations Act, 2016, Pub. L. 114-113 ("2016 Appropriations Act"), and have failed to provide relief to H-2B employers required by Congress.   In the 2016 Appropriations Act, the Congress rejected and disallowed several recently made changes to H-2B regulatory provisions that DHS and DOL jointly had tried to impose in their Interim Final Regulations issued in 2015.   A copy of the pertinent sections of the 2016 Appropriations Act is attached as Exhibit 12, pp. 89-90.   For example, under the Joint DHS/DOL H-2B regulations issued on April 29, 2015, DHS and DOL would have changed the longstanding authorization for H-2B employers to employ foreign guestworkers on a "temporary" annual basis for up to ten (10) consecutive months in a recurring annual period and would have reduced the time to a maximum of nine (9) months in an annual recurring period.   *See* 80 Fed. Reg. at 24,113 *quoting* what is to become 20 C.F.R. § 655.6(b) stating that "temporary need" except for a "one time occurrence" may not exceed nine (9) months.   *See* 2016 Appropriations Act, Pub. L § 114-113, Section 113, saying that "for the purpose of regulating admission of temporary workers under the H-2B program, the definition of temporary need shall be that provided in 8 C.F.R. § 214.2(h)(6)(ii)(B).

19.     The 2016 Appropriations Act further provides that in determining how many H-2B workers may be admitted in any annual period, visas issued to individuals who are returning workers who were employed by an H-2B employer in 2013, 2014, or 2015 shall not be counted toward the maximum 66,000 visas that may be issued at the rate of 33,000 visas for each of the six (6) month periods within fiscal year 2016.   Instead of allowing a simple process whereby the Department of State could inform USCIS of the number of visas remaining available to be issued, USCIS shut down the visa petition process, for days, designed a new form that requires

detailed information about individual proposed H-2B workers that many employers and agents do not have and did not know they would need when the workers were last employed. These new processes were adopted without rulemaking or input from those affected. This was unnecessary to effectuate the provisions adopted by Congress in December 2015 to assist H-2B employers in early 2016. As it is, the DHS component agency Customs and Border Patrol ("CBP") already records entries and departures from the United States and the type of visa under which the individual has been allowed entry. Thus, these agencies and USCIS already had ready access to official records of specific individuals who entered the U.S. in 2013, 2014 or 2015 pursuant to an H-2B visa.

20.     In connection with finally taking steps on February 5, 2016, to implement the Congressional directive adopted on December 22, 2015, that returning workers who held H-2B visas in fiscal years 2013, 2014, or 2015 not be counted toward the 66,000 total number of such workers who could be admitted in fiscal year 2016, USCIS designed a new form called an "H-2B Returning Worker Certification," copy attached as Exhibit 12, pp. 91-94. The text of this form says it must be attached "[a]s a supplement to the certification made on the attached form I-129 Petition . . . ." *Id.* It requires the petitioning employer to name the proposed returning H-2B workers and "certify" that the persons listed on the form were issued an H-2B visa or were changed by USCIS to an H-2B status "during one of the last three (3) fiscal years." The form asks for the returning H-2B workers' "'A' [or alien registration] number, if known," even though a person who has only held an H-2B visa will never have been issued an "A" number. It asked for the date of each "returning" worker's last admission to the United States and the date of change to H-2B status, if known. The form requires that the person signing the "returning

worker form" be the "same person who signed part 7 of [the petitioning employer's Form I-129]."

21.     The returning worker form appears to have been adopted on an ad hoc basis. USCIS chose to issue this form without obtaining authorization to do so from Congress or the Office of Management and Budget, thereby violating the Paperwork Reduction Act, 44 U.S.C. § 3506(c)(2)(A) and rulemaking requirements under the Administrative Procedure Act, 5 U.S.C. § 553.

22.     Besides issuing and requiring completion of the extra-legal "H-2B Returning Worker Certification" form – by the same person who had signed the employer's original I-129 form in connection with its February 5, 2016, first announcement of the mandatory use of this form after this provision was adopted on December 22, 2015.  USCIS limited the availability of the "returning worker exception" to the 66,000 worker cap for fiscal year 2016 by requiring that employers must identify those workers to USCIS by submission of the H-2B Returning Worker Certification no later than March 4, 2016, not even 30 days after USCIS announced employers must use the extra-legal form.  *See* Exhibit 12, pp. 91-94; s*ee also* Exhibit 12, pp. 95-97.  Thus, after delaying implementation of the Congressional exclusion of returning H-2B workers from December 22, 2015, USCIS gave employers and their agents, including Plaintiffs, under 30 days within which to identify all persons eligible for exclusion from the cap, make arrangements with the proposed workers to accept employment with the employer, and file an unapproved form to certify with the USCIS detailed information about their names, as well as other information on one of the I-129 attachments, Attachment 1, pages 35 and 36 of the I-129 package.

23.     While the effects of these unlawful restrictions on the use of the H-2B exemption from the visa cap are unsupportable as to workers who might be available and willing to return to

one of their prior employers from 2013, 2014 or 2015, restrictions on the use of the "cap" exclusion make it virtually impossible for an employer that had not previously employed a particular worker in 2013, 2014 or 2015, to be able to locate, make arrangements with and "name" that worker fully on the USCIS form by March 4, 2016.

24.     After indicating in its February 5, 2016 email notice to Plaintiff Agents and H-2B employers that H-2B employers were merely "*urged*" to identify H-2B workers to USCIS on the ad hoc-adopted " "H-2B Returning Worker Certification" form – see the italicized heading in the email message from USCIS, "H-2B Employers Are Urged to Identify Returning Workers when [sic] Filing Petitions," Exhibit 12, pp. 91-94, then USCIS described the completion of the "H-2B Returning Worker Certification" as "additional requirements . . . applicable for H-2B returning workers . . . ."   USCIS even acknowledged that the U.S. Consular officials in the proposed worker's home country can determine if the person meets the requirement of having been issued an H-2B visa in the required three (3) year period without input from the employer or the USCIS form.   "The U.S. Consulate may deny a visa. . . if workers cannot be confirmed as returning workers, or are otherwise ineligible for admission or visa issuance."   *Id.*   In fact, the actual sentence USCIS placed in its email notice in which it first "urged" and then "required" the information on the form admitted that both the Consular officials and officials of the USCIS sister agency, the U.S. Custom and Border Protection (CBP), can, without any input from the employer, agents, or USCIS determine if a particular proposed H-2B employee meets returning worker and other applicable requirements for admission..  The email instruction says:

> The U.S. Consulate may deny a visa or a U.S. Customers and Border Protection (CBP) port inspector may refuse admission of worker if workers cannot be confirmed as returning workers, or are otherwise ineligible for admission or visa issuance.

*Id.* Then USCIS claimed that "DHS and Department of State will work together to confirm that all certified returning workers qualify for the program. *Id.*

25.     Rather than working with resources within the DHS agency, CBP, and the Department of State records, USCIS has allowed adjudicators to add even more impermissible hurdles to using the returning worker program.  For example, by Requests for Evidence issued on March 9, 2016, in connection with a case that had been filed with extra money paid for "premium processing" of the visa petition by Plaintiff Amigos on behalf of its employer client Full Care of Indianapolis, Inc. ("Full Care"), that as shown by Exhibit 12, pp. 39-43, needs its H-2B workers to operate its business, Full Care and Amigos were informed that they must establish that the planned for returning workers were in a valid, nonimmigrant status at the time the petition for visa issuance was filed.  Necessarily, if the workers were then outside the United States and would apply for their visas at a U.S. consulate in Mexico, they were then in a "valid" nonimmigrant status.

26.     USCIS demanded that Full Care provide additional evidence, all of which was already readily available to the CBP and the Consulate in Mexico, and that in the past USCIS has been able to determine from official U.S. computer databases concerning the status of foreign nationals.  There is an overall limit of three (3) continuous years in a nonimmigrant H-2B status that any particular individual may be afforded under a series of visas, but the accumulation of three (3) years in the United States can be broken in multiple ways, including by leaving the United States and remaining outside the United States for specific periods of time depending on the amount of time the individual has been within the United States.  Depending on these factors, the accumulation of the three (3) years is "broken" or interrupted so that the count for the three (3) year period begins again.  The computation of this limitation is extremely complex.

Normally, employers and their agents are only required to provide details and proof in the way of documentary evidence of when a proposed visa beneficiary was outside the United States if they want to challenge the federal government record of when the person was present and when the person was outside the United States based on what is shown on the official Federal databases. If the official records of the United States government show that the proposed employee beneficiary is eligible for entry and for the work period set forth in the certification,, there is no good reason for USCIS to demand that employers affirmatively establish that an individual presently outside the United States is eligible to receive the returning worker visa when, as USCIS recognized in its regulatory promulgations in 2008, each individual must present himself or herself at a United States consulate and be examined for eligibility, and then the person may be examined again at the port of entry by CBP to determine if he or she meets the appropriate criteria for admission.

27.    In these and many other ways, if together the DHS and DOL Defendants had deliberately set out to subvert the application of the Congressional mandates in the 2016 Appropriations Act and generally through extra requirements and unlawful demands to prevent the H-2B employers from obtaining their rights to make effective use of their rights under 8 U.S.C. § 1101(a)(15)(H)(ii)(b), they could not have more thoroughly or completely thwarted the aims of recent Congressional actions and long-standing statutory law.

## **PARTIES**

28.    Plaintiff Amigos Labor Solutions, Inc. ("Amigos") is a Texas Corporation with its principal place of business at 3141 Hood Street, Suite 333, Dallas, Texas, 75219.

29.    Plaintiff Labor Consultants International Co. Ltd. ("LCI") is an Idaho Corporation with its principal place of business at 1831 North Lakewood Drive, Suite B, Coeur d'Alene, Idaho, 83814.

30.     Plaintiff Mas Labor H2B ("Mas Labor") is a Virginia Corporation with its principle place of business at 650 Front Street, Lovingston, Virginia, 22949.

31.     Plaintiff VTB Solutions, Inc., d/b/a Practical Employee Solutions ("Practical Employee Solutions" or "PES") is a Texas Corporation with is principal place of business at 12300 Winding Hollow Lane, Frisco, Texas, 75033.

32.     Defendants are Thomas E. Perez, in his official capacity as United States Secretary of Labor, William Thompson, in his official capacity as Acting Administrator, Office of Foreign Labor Certification, Employment and Training Administration, United States Department of Labor, Brian Pasternak in his official capacity as Deputy Administrator, Office of Foreign Labor Certification, Employment and Training Administration, United States Department of Labor, United States Department of Labor as a Party, Jeh C. Johnson, in his official capacity as Secretary of the Department of Homeland Security, Leon Rodriguez, in his official capacity as Director of the United States Citizenship and Immigration Services, Donald Newfeld, in his official capacity as Associate Director Service Center Operations Directorate of the USCIS, Laura Zuchowski, in her official capacity as Director of the USCIS Vermont Service Center, Kathy A. Baran, in her official capacity as Director of the USCIS California Service Center and the United States Department of Homeland Security. The Defendants may be served pursuant to Rule 4 of the Federal Rules of Civil Procedure or as otherwise permitted by law.

## JURISDICTION AND VENUE

33.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because officers and agencies of the federal government are parties, and this matter presents a federal question arising under federal law and under the United States Constitution.

34.     This Court has jurisdiction over the subject matter of the case pursuant to the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 701, *et. seq.*; the Declaratory

Judgment Act ("DCA"), codified at 28 U.S.C. § 2201, *et seq.;* the Immigration and Nationality Act of 1952 as amended by the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101(a)(15)(H)(ii)(b) and § 1184(c).

35.     Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1391(c) and (e), 5 U.S.C. § 703 and the Local Rules of the Northern District of Texas, Appendix II.3, in as much as Plaintiff Amigos is located within Dallas County within the Dallas Division of such Court. Defendant U.S. Department of Homeland Security and United States Department of Labor maintain permanent offices within Dallas Texas. All of the other Defendants are component agencies of these Departments. The individual Defendants are sued in their official capacities and may be sued in this venue.

36.     Plaintiffs bring this action for declaratory and injunctive relief and a *Writ of Mandamus* as a result of the failures of DHS and DOL and their respective component agencies and officers charged with such responsibilities to act timely and in accordance with law upon applications for H-2B labor certification and to adjudicate and approve petitions seeking such visas in a timely manner, in accordance with applicable regulatory and statutory requirements, to permit the employer clients of the Plaintiffs and Plaintiffs' employers access to a legally authorized workforce when and where the guestworkers are needed.

37.     The operating owner executives of the Plaintiffs Agents have filed on behalf of clients in the H-2B (or predecessor H-2) program annually on behalf of hundreds of clients for 18 to 30 years. Plaintiffs Amigos, LCI, Mas Labor, and Practical Employee Solutions are all "agents" within the meaning of that term under the Joint DHS/DOL H-2B regulations issued April 29, 2015, to be codified at 20 C.F.R. § 655.5 (definition "*agent*" published at 80 Fed. Reg. 24,110, (third column)). Their roles as entities authorized to file H-2B applications on behalf of

their employer clients is also recognized at 20 C.F.R. § 655.7, published at 80 Fed. Reg. at 24,113 (middle column). They have each met all requirements pursuant to what will become 20 C.F.R. § 655.8, published at 80 Fed. Reg. at 24,113 (middle column). These Agent Plaintiffs may be referred to collectively as "the Agents," and as noted above, while the Joint DHS/DOL regulations were published only on April 29, 2015, these Agents each have functioned in their current roles as H-2B agents for many years.

38.     As an example of how the current H-2B program has worked and how the prior H-2 program worked, all under the same statutory authorization, landscape maintenance employer clients of the Agents require temporary workers during certain months of the year to perform seasonal landscape maintenance during warmer months, from early spring through fall when vegetation is actively growing, grass must be mowed, growing shrubbery must be pruned, and annual plants must be set out, watered, and otherwise tended.  During the coldest winter months, some of these landscaping organizations cease all such outside plant care work altogether and thus are truly "seasonal" in that they provide no plant-related services during certain periods of the year. Other landscaping services sharply curtail all outside plant-related services for certain periods of the year, but, on an occasional basis, their local climates permitting, do engage in limited plant care and installation work, pick up fallen tree limbs, and perform work within the H-2B job description, thus making their needs for "temporary" workers what is called a "peakload" need in which the employers must greatly expand their workforces to handle high season workloads during the spring, summer, and fall, while maintaining a small cadre of persons who sometimes perform work with plants during the coldest winter months. Together DHS and DOL have created vast confusion about the understandings of these terms among their respective staffs and among H-2B employers.  Other types of business clients of the

Agents also have temporary workforce needs that may be truly seasonal, in that the businesses only operate part of the year, or they may have peakload needs that may be tied to the seasons. All require temporary workers to meet their staffing needs.   These include hotels, inns, restaurants, golf courses, tree-planting companies, and others including a brick refractory company in Fort Worth that could not bid jobs it did not have workers to perform.  *See* Exhibit 12, pp. 31-32.

39.    Because the employers are unable to offer fulltime work year-round because of the temporary nature of the jobs for which they require workers or because some workers prefer not to engage in arduous outdoor work or other jobs for which U.S. workers are not available, Plaintiffs' clients in landscaping and other businesses that rely on the H-2B program routinely face shortages of sufficient numbers of able, willing, qualified and legally authorized U.S. workers to perform the work needed to operate their seasonal businesses or to fulfill seasonal or other temporary contractual obligations to their customers and clients.

40.    As DOL and DHS have publicly recognized, other U.S. employers to which the Agents routinely provide services and that require temporary H-2B workers include resorts, inns, restaurants, and hotels that face seasonal upsurges in needs for employees to provide housekeeping and related hotel, resort and restaurant services.  Many of these resorts, hotels, inns, restaurants and related facilities are in isolated areas with small local populations that cannot or will not meet the workforce needs of the employers.  Some U.S. workers simply do not want to perform these jobs. *Rogers v. Larson*, 563 F.2d 617 (3d Cir. 1977), a case involving the pre-IRCA H-2 temporary foreign guestworkers program, discusses some of the problems that Congress attempted to address in the temporary foreign guestworker program on which Agents and their employer clients rely.  The *Larson* Court noted that many U.S. citizens of the Virgin

Islands were unwilling to accept the domestic labor, tourist industry and agricultural jobs employers needed to fill because they considered them to be degrading and undesirable, thus making H-2B employers of such workers and indeed the whole economy of the Virgin Islands economically dependent on the necessary availability of temporary H-2 workers from neighboring islands. *Rogers* 563 F.2d at 624. Thus, as the Third Circuit recognized in *Larson*, "[t]he common purposes" of the INA provisions related to "temporary" laborers "are to assure an adequate labor force on the one hand and to protect the jobs of citizens on the other. Any statutory scheme with these two purposes must inevitably strike a balance between the two goals." *Rogers*, 563 F.2d at 626.

41.     When Congress amended the INA via the Immigration Control and Reform Act ("IRCA") in 1986, the only change it made to 8 U.S.C. § 1101(a)(15)(H)(ii) was to create subpart "a" as applicable to agricultural workers and subpart "b" as applicable to temporary workers in nonagricultural jobs, hence the term H-2B.   The INA provision under which temporary workers such as these Agents and their employer clients need in order for their businesses to survive was not otherwise changed.   Pub. L 99-603, Title III § 301(c), 100 Stat. 3411, 3434 (Nov. 6, 1986).

42.     The H-2B visa program gets its name from the provision of the INA, as amended by IRCA, where it is codified. 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The H-2B visa program permits foreign guestworkers to enter the United States on a temporary basis to "perform temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in [the United States]." *Id.*  Plaintiff Agents and their employer clients are economically dependent on the availability of workers being available when and where they are needed through the H-2B program.

43.     U.S. employers are able to hire foreign guestworker nationals on a seasonal or other temporary basis through the H-2B program after the employer demonstrates a shortage of U.S. labor and completes an application process that involves three (3) federal government agencies and individual visa application forms filed by the proposed workers. First, an employer that expects to need temporary foreign guestworkers obtains a "labor certification" from DOL's OFLC.  A certifying officer ("CO") issues such a "certification."  Second, after receiving a "certification" from OFLC, the employer files a petition with USCIS. Once the petition is adjudicated by an USCIS adjudicator, the third step is for the employer to file the approved petition with the Department of State in support of a prospective H-2B employee's application for issuance of an H-2B visa by a Consular official, usually in the employee's home country, although an individual who is already in the United States in a lawful status is not required to return to his or her home country to make the H-2B visa application.  Once all of these steps have been completed, an interview session at the appropriate State Department Consulate in the prospective worker's home country must be scheduled if the worker is not already in the U.S. in connection with another job or activity he or she is legally permitted to be in the U.S. to perform. The individual must appear for an interview, and if the Consular Official approves his or her application for issuance of a visa, then under procedures adopted by some of the the Consular Offices of the United States in Mexico as of February 29, 2016, prospective H-2B employees now must wait until the third day after they have presented themselves at the consular location for their visas to be printed so they can then begin their journey to cross the United States border and begin their travels to the worksite of their intended employer.  As an example, Consular processing in Jamaica can take up to 20 days.

44.     Employers that seek to hire foreign guestworkers under the H-2B program must apply for and receive a temporary "labor certification" from DOL's OFLC that they file along with their petition that is filed with the USCIS. 8 C.F.R. § 214.2(h)(6)(iii).  The purpose of the labor certification process is to ensure that "there are not sufficient workers who are able, willing, qualified, and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such services or labor."  8 C.F.R. § 214.2(h)(1)(ii)(D), and that the employment of the H-2B workers will "not be adversely affecting the wages and working conditions of United States workers." 8 C.F.R. § 214.2(h)(6)(i)(A).

45.     As of the close of business March 18, 2016, Plaintiff **Amigos** has filed 43 petitions with the USCIS, accompanied by labor certifications on behalf of these proposed H-2B employers, virtually all of which were approved by OFLC to receive H-2B guestworkers in prior years as well as in 2016.  Some employers required H-2B workers to fill time-sensitive, seasonal and other temporary positions earlier this year.  Other H-2B workers were supposed to have commenced work this season on April 1, 2016.  As of March 18, the petitions have not been acted upon by USCIS, thereby guaranteeing in the practical sense that these workers will not be available to begin work on April 1, 2016.

46.     As of the close of business March 18, 2016, Plaintiff **LCI** had filed only 19 petitions with the USCIS, accompanied by labor certifications. Most of the 141 affected employers on behalf of which it acts have not had their labor certifications issued despite employer dates of need as early as February this year.  Other H-2B workers were supposed to have commenced work this season on April 1, 2016.  As of March 18, most employers' applications have not been acted upon by USCIS or DOL/OFLC, thereby guaranteeing in the practical sense that these workers will not be available to begin work on April 1, 2016.

47.     As of the close of business March 18, 2016, Plaintiff **Mas Labor** has filed 372 visa petitions with the USCIS, all accompanied by labor certifications, on behalf of affected proposed H-2B employers, that have dates of need of April 1, 2016 or before on which visa authorizations have not been issued.   Virtually all of these employers have used the H-2B program successfully in the past.  In addition, Mas Labor had 73 applications at DOL/OFLC for which labor certifications had not been issued for employers that need workers by April 1.   Of these applications, 25 employers needed their workers by March 15, or before.  As of March 18, they have not been acted upon by USCIS, thereby guaranteeing in the practical sense that these workers will not be available to begin work on April 1, 2016. Among many problems for Mas Labor clients, after it duly filed the labor certification application form its client Hydro-Tech Irrigation Co., for 20 workers with the OFLC on January 1, 2016, the earliest day possible under the new rules, nothing happened to the applications for week.   Finally, Mas received the labor certification and immediately filed the petition with the labor certification with USCIS on March 2, 2016. Hydro-Tech has been a successful user of the H-2B program and a Mas client since 2008.  It has a time-sensitive need for these 20 workers to work as landscape laborers beginning on April 1.   That cannot possibly happen, especially since it received a Request for Evidence on March 15, 2016.   In another case, Mas Labor filed an application for labor certification for BB Stoneworks, Inc., a Colorado client since 2011 on January 6, 2016.  It needs 20 workers to begin time sensitive work as Production Laborers on April 1, 2016. That same day, on January 6, the employer filed with DOL a second application for 14 workers to begin work on April 1, 2016 as Machine Operators. DOL issued a Notice of Acceptance for the first application on February 9, 2016, and the employer submitted its Recruitment Report to DOL on March 4, 2016. DOL did not issue the labor certification until March 16, 2016. Mas Labor filed the visa petition with

USCIS the same day, March 2016, 2016. As for the application for labor certification for the Machine Operators, DOL issued a Notice of Acceptance for the second application on February 22, 2016. The employer submitted its Recruitment Report to DOL on March 17, 2016, but to date DOL has not issued a labor certification.

48.    As of the close of business March 18, 2016, Plaintiff **Practical Employee Solutions** had filed 11 petitions with the USCIS, accompanied by labor certifications, on behalf of affected proposed H-2B employers, on which USCIS has not issued visa authorizations. Virtually all received H-2B guestworkers in prior years.   Some employers required H-2B workers to fill time-sensitive, seasonal and other temporary positions in March.   Most of its clients' H-2B workers were supposed to have commenced work this season on April 1, 2016.  As of March 18, they have not been acted upon by USCIS, thereby guaranteeing in the practical sense that these workers will not be available to begin work on April 1, 2016.   Practical Employee Solutions has 78 applications pending at DOL/OFLC, most for employers that needed their workers by April 1.

49.    Each of the Agent Plaintiffs' H-2B Employers' petitions was filed with the prospective employer paying extra for what is known as "Premium Processing," under which USCIS has obligated itself to adjudicate the respective petition in accordance with criteria lawfully and fairly imposed on the employers within fifteen (15) days of receipt.  Each employer paid USCIS One Thousand Two Hundred Twenty-Five Dollars ($1,225) in additional fees for this service to be provided with respect to each petition filed on its behalf.

50.    USCIS has been on notice that it has repeatedly failed to meet the 15 day deadline for adjudicating urgently needed employer petitions and that its staff have been applying legally incorrect standards and issuing legally (and in some cases factually) incorrect Requests for

Evidence.  Petitions filed with the USCIS are filed with either the USCIS Vermont Service Center under the direction of Laura Zuchowski or the USCIS California Service Center under the direction of Kathy A. Baran, both Defendants in their respective official capacities, depending on the part of the United States the employment will be located. On information and belief, Defendant Donald Newfeld is the Associate Director, Service Center Operations Directorate for both Service Center locations.

51.     In many instances, Federal Express records show delivery dates for petitions as many as several days before the Centers have acknowledged receipt.  The delay in issuing notices of receipt makes it appear that petitions have been pending less time than in fact they have been waiting response.  Moreover, many Requests for Evidence have been issued on the fourteenth or fifteenth day after the Center has finally acknowledged receipt, thereby making it appear that actions, albeit unwarranted, were at least timely.

52.     All Plaintiffs have received multiple Requests for Evidence stating that additional evidence of a temporary need beyond the evidence already reviewed and found adequate by OFLC was required.  Many of the affected employers have successfully used the H-2B Program for many years.  Nonetheless, they submitted payroll records, quarterly tax returns, letters from the National Landscape Association, the American Hotel and Lodging Associates and other documents that demonstrate that their own businesses and businesses like theirs regularly must use temporary workers and that their needs meet applicable definitions for temporary or other seasonal needs.  *See* Exhibit 12, pp. 30-32, 39-60, 70-88, 110-113, 116-147, 174-175.

53.     Many employers submitted evidence demonstrating that beginning on the date for which they sought authorization to hire temporary foreign guestworkers, historically the employers had needed a substantial increase in the number of workers available to perform tasks

within the job description and that such "peakload" temporary need for the services of such workers continues this year, and as it has in the past needed such workers  until the date on which the employers now seek to end the H-2B visa work authorization of their proposed workers.  To the extent that the requested beginning date of such planned temporary employment is later in the calendar year than the employer has in the past substantially increased the number of employees who perform such work, the employer has already been forced to rearrange and re-calendar its work performance commitments to its customers – and delay or forego its period of increased revenues -- to begin such work commitments no earlier than April 1 because in recent years, by any date later than about January or February, depending on the year (and the status of the recovery of the U.S. economy from the Great Recession), all 33,000 H-2B visas available in the first half of the Federal fiscal year would have been used.  Thus, some employers have already rearranged their business schedules and rely on workers being available April 1, the first date employees issued one of 33,000 visas for the second half of the fiscal year that starts April 1 can be lawfully employed.  Thus, many employers that feared being "capped out" and thus unable to obtain H-2B visa approvals for work dates earlier in the calendar year have already rearranged and curtailed their work commitments to begin materially increased workloads starting on April 1.  Some of these employers are able to obtain a small cadre of year round workers who sometimes plant a tree, clean up lawn debris, or perform other limited work within the H-2B job description in the dead of winter, but these small year round cadres of workers for these H-2B employers cannot perform all of the work that their H-2B employers have already committed themselves contractually to perform—in some cases backed by performance bonds. Moreover, whether the employer is a landscape operator, a restauranteur, or a golf course operator, the employers may aspire to sell "new business."   Based on historical trends and

estimates of potential for business growth, in all cases, they need workers when and where they need them during their peakload seasons. The employer clients and the Agents submitted payroll records, quarterly tax returns, letters from the National Landscape Association and other documents demonstrating that in the locale in which the intended employment will be performed, such work can and is performed by this employer at this materially increased peakload rate requiring a substantially larger workforce only during the designated period for which H-2B visa authorization was being sought. As of March 18, USCIS has been in possession of multiple duly filed petitions on behalf of such employers and evidence demonstrating their temporary needs for workers for the period requested. USCIS has not adjudicated or corrected its position on such petitions. In some cases USCIS adjudicators demanded employers' form 941 tax filings but did not know that according to the tax form filing instructions, the reported employee headcount for a month or quarter is only the headcount on a particular day of each month. Thus, increases or decreases in headcount during the month on the day before the "headcount day" and increases or decreases in headcount during the month on the day after the "headcount day" do not show up as historically reflecting the actual change in numbers of employees employed during the month. Instead of understanding that an employer that needs workers on March 15 might in fact ramp up operations year after year on March 15, yet its 941 tax filings will reflect its smaller headcount from the headcount reporting day earlier in the month. Likewise, an employer that has a large headcount until November 15 and then drops its headcount to reflect the colder weather will not have this headcount reduction in a report that is based on its November 12 headcount. A seasonal amusement industry employer that totally shuts down in the dead of winter, has no employees during that time, and has used the H-2B program for part of its temporary worker workforce was denied participation in the H-2B program because the USCIS adjudicator

misapplied the applicable rules for determining if an employer has a "temporary" period of under a year for a position to be filled.  Exhibit 12, pp. 62-65.

54.     The failures by USCIS to process and timely approve the above petitions, cited as examples, that were filed pursuant to the Premium Processing services requirements for which the respective Plaintiff Agents' employer clients paid and on which they relied were unreasonable failures by the DHS/USCIS Defendants.

55.     Requests by USCIS official adjudicators to prove the respective employers' "temporary" needs after they have already made such an evidentiary showing to the DOL/OFLC as part of the DOL Labor Certification Process were and are also unreasonable, especially, where, as here, common sense and climate history reasonably demonstrate that work such as that performed by the respective employers' employees necessarily will cease at the end of their employers' "season" or be at least sharply curtailed so the period when each employer's seasonal peakload need has ended is clear during the coldest winter months when there are typically freezing temperatures, often snow on the ground, plants are dormant, etc. As a result of the unreasonable delays and duplicative and nonsensical Requests for Evidence on such matters as the climate-dictated work periods during which the employers need workers to perform these jobs or need substantially more workers for these jobs, both the Plaintiff Agents and their respective employer clients have already suffered and will continue to suffer irreparable harm. Employers that cannot obtain sufficient workers to perform their contractual work obligations and conduct normal business operations, as they have come to expect and rely on by using the H-2B program to employ workers who are legally present in the U.S. and authorized to work, may go out of business and will necessarily suffer irreversible financial loses as well as substantial and irreparable damages to their reputations. Likewise, each of the respective Plaintiff Agents

faces losses of their respective businesses if their employer clients cannot rely on the H-2B program as a means of timely and reliably obtaining sufficient legal workers to perform their business operations.  The U.S. employees of the respective Plaintiff Agents as well as the U.S. employees in other (*i.e.* non H-2B) positions of the respective employer clients also face substantial and irreparable harms by the loss of employment because of the loss of business and business revenue of their respective employers and their potentially, ever-more-likely crippling inability to operate this spring. There is no end in sight to the delays or unreasonable Requests for Evidence and other actions by USCIS that have caused and continue causing inordinate and unreasonable delays and irreparable injuries despite representatives of Plaintiff Agents having met with Kevin Cummings, Chief, Business and Foreign Workers Division, USCIS on Thursday, March 10, 2016, to apprise him of the acts and failures to act by DHS, USCIS and the officials of these agencies.  These Plaintiff Agents and their employer clients also communicated directly and through Congressional Representatives with officials of both DHS/USCIS and DOL/OFLC of the extent of the failures and the consequences to Plaintiffs, to Plaintiffs' clients and to all of their employees.  *See* Exhibit 12, pp. 109-115, 158-167, 174-175, 187-189, 234-240, 241-247. *See also*, Exhibit 12, pp. 1-17, submitted to counsel for Defendants on March 23, 2016, p. 156, DOL Announcement of Emergency H-2B Processing Procedures on February 19, 2016, p. 157, Announcement by Acting OFLC Director of leave from March 21 through March 28, 2016. Through a letter containing detailed descriptions of problems Plaintiffs Amigos and Practical Employee Solutions were having with delays beyond regulatory response requirements on the agency and other problems, by letter dated February 18, 2016, to DOL/OFLC Deputy Director Brian Pasternak was directly advised that such problems were already serious and were getting worse.  See Exhibit 13 and other Exhibits referenced herein. The Agency Defendants are well

aware of their failings but have not corrected these failings.   Instead, processing times have

increased and silly, illegal Requests for Evidence have continued, with new and surprising

additional demands.  *See* Exhibit 12, pp. 1-17, 66-69, 114-115, 156, 159-162, 187-189, 241-242,

248-261.

56.     As another example of the unreasonable treatment to which Plaintiffs and their

employer clients have been and continue to be subjected, by telefax delivered to Plaintiff

**Amigos** on February 23, 2016, Amigos and its client employer were falsely accused of

"attempting to misrepresent a material fact" concerning the content of a letter memo issued by

Thomas Cook, then Acting Assistant Commissioner for the U.S. Department of Justice (DOJ),

Immigration, and Naturalization Service (INS) on February 1, 2002, when the INS was the

component agency of the DOJ to which H-2B petitions were filed before the functions of the

U.S. Attorney General and INS were transferred to the newly created United States Department

of Homeland Security and its component agency, the USCIS.   See 8 U.S.C. §1103(A). For

convenience, this February 1, 2002 memorandum will be referred to as the "Cook memo."

57.     A copy of the USCIS telefax coversheet and related documents stating the "Intent

to Deny" the petition filed by Amigos on behalf of Archway Lawncare and Landscaping is

Exhibit 12, pp. 33-38.   USCIS incorrectly contends that in a letter of support explaining the

failure of the employer to have named all of the proposed H-2B petition beneficiaries, *i.e.*

prospective temporary guestworkers, at the time of filing the I-129 petition on behalf of the

employer, the employer and Amigos had incorrectly quoted from the Cook memo as part of their

explanation of why a petition necessarily filed so long in advance of the planned actual work

start date could not accurately list all of the workers who would in fact make themselves

available for the job at that future date. The Notice of Intent to Deny quoted a section of the

Cook memo cited by Amigos as allegedly missing from the Cook memo. As the actual Cook memo shows, the letter of support correctly stated that the Cook memo states in support of the request for deviation from listing every proposed H-2B beneficiary, "[f]urther, Service officers may rely totally on the verbal assertions of the petitioner in determining whether the petitioner has a valid business reason for not providing named beneficiaries."

58.     The Defendant USCIS adjudicator incorrectly contended, "[h]owever, USCIS has reviewed a copy of this memo, and the original memo does not appear to contain this quoted section. By providing this quote, it appears that you are attempting to misrepresent a material fact." On this basis, USCIS issued a Notice of Intent to Deny the petition saying, "[i]f you have provided false or misleading information, then the beneficiary is not clearly eligible for classification under this section." The petitioning employer and its agent Amigos were then granted thirty (30) days from the date of the Notice or thirty three days (33) if the notice had been received via U.S. Postal Mail, the usual appeal time, to provide "additional information, evidence, or arguments to support the petition."

59.     With the Cook memo having been issued so long ago, February 1, 2002, and Amigos' internal documents reciting content from the Cook memo that it could no longer locate in full text, Amigos did not have at its immediate disposal a full copy of the Cook memo. It required several days and extraordinary efforts to obtain a full copy of the Cook memo. Upon receipt of the Cook memo, Amigos, by facsimile transmission on March 4, 2016, submitted the full copy of the Cook memo. The Cook memo is attached as Exhibit 12, p. 38.  The first paragraph of the Cook memo makes it clear that the subject of the memorandum is the practice of H-2B employers and their agents of filing H-2B petitions that contain requests for authorization for issuance of visas to unnamed "beneficiaries," *i.e.* proposed H-2B employees.

The Cook memo says in part, "[t]his memorandum modifies only the portion of the initial memorandum dealing with unnamed beneficiaries by indicating that directors should require the H-2B petitioner to provide the business reason for not listing the names of the beneficiaries. This memorandum also clarifies that H-2B petitions may include both named and unnamed beneficiaries." Cook memo, Paragraph 1.

60.     The Cook memo also expressly discusses the type and source of evidence that should be presented to justify why an H-2B petition has not included the names of all proposed beneficiaries. The concluding sentence of the third substantive paragraph of the Cook memo specifically says:

> Further, Service officers may rely totally on the verbal assertions of the petitioner in determining whether the petitioner has a valid business reason for not providing named beneficiaries.

The fifth substantive paragraph of the Cook memo says specifically:

> Service officers are also reminded that named and unnamed beneficiaries may be included on the same H-2B petition.

61.     The DHS/USCIS regulations under which petitions are currently submitted for USCIS adjudication are those adopted by DHS by Federal Register Notice issued at 73 Fed. Reg. 78,104-78,130 (Dec. 19, 2008). The DHS regulations governing the naming of proposed H-2B workers in their employers' petitions are currently codified at 8 C.F.R. § 214.2(h)(2)(iii) under the topic "*[N]aming beneficiaries.*" Under this current DHSUSCIS provision:

> *Except as* provided in this paragraph (h), all H-2A and H-2B petitions must include the name of each beneficiary who is currently in the United States *but need not name any beneficiary who is not currently in the United States.*

(Emphasis supplied).

62.    Unnamed beneficiaries must be shown on the petition as a total number.  In 2008, this regulation was formally adopted, DHS said, to "give employers far greater flexibility to recruit workers who are interested and available to start on the date needed."  73 Fed. Reg. at 78,108.  On the subject of the effect of not requiring employers to name proposed worker beneficiaries who were then currently outside of the United States, the subject arose as to how, the unnamed proposed beneficiaries would be tracked to be sure that they did not exceed their personal three (3) year limit on their maximum "unbroken" or continuous presence in the United States. At that time, DHS said that this eligibility requirement would be – could be -- met because "[u]pon approval of the H-2B petition, these prospective beneficiaries must generally undergo a visa interview at a U.S. consulate, unless they are visa exempt (*e.g.*, Canadians).  All individuals seeking admission to the United States must undergo inspection by a U.S. Customs and Border Protection Officer upon arrival at a U.S. Port of Entry. During this visa application and/or admission process, the necessary screening will be conducted to ensure that the H-2B worker will not be granted any benefit exceeding the 3-year ceiling." 73 Fed. Reg. at 78,108 (third column).

63.    Thus, not only is the allegedly missing sentence in the Cook memo actually present in the Cook memo as the concluding sentence of paragraph 3 of the Cook memo, the recently instituted, ad hoc practice by USCIS of requiring H-2B employers to provide detailed information about who the proposed returning workers are, including those returning workers who held H-2B visas in 2013, 2014 or 2015 who, pursuant to the 2016 Congressional Appropriations Act, Section 565, will not have the issuance of their visas counted against the total of 66,000 H-2B visas that may be issued during 2016, is unnecessary as DHS recognized

when it explained the operation of the current DHS/USCIS regulations on their promulgation in 2008.

64.     Thus, the claim by USCIS that it appeared that Plaintiff Amigos and its client Archway Lawncare and Landscaping were "attempting to misrepresent a material fact" is in fact a false accusation. The sloppiness or other reason for failure of the USCIS adjudicating official to be familiar with the now longstanding Cook memo of 2002, the failure by the adjudicator to have read the document fully before making the false accusation and placing Amigos and its client to such demands, delays, expenses, and stresses, and the failure to have applied 8 C.F.R. § 214.2(h)(2)(iii), but instead issuing a formal Notice of Intent to Deny the employer's petition comprise one of many examples of actions by USCIS adjudicating officials that have imposed demands they may not legally make.  They have caused unreasonable delays in petition processing and issuances.  They have driven up costs of participating in the Program that allows employers access to lawfully present guestworkers.  They have created unrelieved stomach acid in Plaintiff Agents and their employer clients.  They have discouraged participation in the H-2B program.  In innumerable ways large, small, redundant, ad hoc and individualized, USCIS adjudicator and DOL/OFLC  certifying officer-initiated, DHS and DOL have discouraged and are actively, if not deliberately, discouraging the lawful use of this Congressionally authorized H-2B program whereby employers that require temporary workers they cannot obtain within the United States may lawfully engage the services of temporary foreign guestworkers who support their businesses and allow their U.S. employees and themselves to continue to earn their livelihoods.

65.     OFLC has also unlawfully imposed restrictions and demands and failed to act in accordance with applicable requirements on its and its officers' actions.   H-2B employer

petitions filed with the USCIS "shall be accompanied by" among other documents, a "labor certification" issued by the Secretary of Labor.   *See* 8 C.F.R. § 214.2(h)(vi)(A); *see also* Fed. Reg. at 24,111 and 24,126, to be codified at 20 C.F.R. §§ 655.5 and 655.52.  The Secretary of Labor has designated such determinations to be made by the national certifying officer, the Administrator of the OFLC, who has in turn delegated authority to issue such certifications to a subordinate certifying officer (CO) of the OFLC.  OFLC is governed by the same statutory provision and regulation defining the word "temporary" as is DHS/USCIS.  OFLC examines whether an application establishes an employer's "temporary" need.  Under applicable USCIS procedures, an employer's petition must also be filed with a statement of need provided by and for the petitioning employer that describes "in detail the temporary situation or conditions which make it necessary to bring the alien to the United States and whether the need is a one-time occurrence, seasonal, peakload, or intermittent [need]." 8 C.F.R. § 214.2(6)(vi)(D). Additionally, the same provision provides that:

> If the need is seasonal, peakload, or intermittent the statement shall indicate whether the situation or conditions are expected to be recurrent.

66.   The DHS regulations plainly contemplate, as provided in the underlying INA statutory provision, and has been the practice virtually since the INA was adopted in 1952, particularly since 1954, that employers that require temporary foreign guestworkers may have a recurring need each year and are not barred from using the H-2B visa program if their temporary need recurs annually. *See, e.g*., the rulings in several federal courts under the H-2 program before the agricultural program was split from the nonagricultural program without other change to the eligibility standards applicable to employers that require "temporary or service or labor" in connection with the Congressional enactment of IRCA. *See, e.g., Presidio Valley Farmers Ass'n.*

*v. Brock*, 765 F2d 1353, 1355 (5th Cir. 1985) (explaining prior history of the case that included the issuance of injunctions against both DOL and USCIS in 1978 because without the needed H-2 workers to harvest the onions, the farmers' onions were rotting in the fields); *Frederick Cty. Fruit Growers' Ass'n v. Marshall*, 436 F.Supp. 218 (W.D. Va. 1977) (historically approximately 60% of the workforce having come from offshore sources); *Kimball Heights Farms v. Marshall*, C.A. No. 77-240 (D. N.H., Aug. 18, 1977) ("In the last several years, the primary source of full-time apple pickers [for the picking season] has been the British West Indies."); *Patterson Orchard v. Marshall*, C.A. No. 77-147 (D. Vt. June 30, 1977) (grower members of the Shoreham Cooperative Apple Producers Association won injunction to allow importation of workers from the British West Indies "for the short but economically critical apple harvest.").  *See also Rogers v. Larson*, 563 F.2d 617 (3rd Cir. 1977) noting that employers needing hotel housekeeping workers in jobs in which H-2 workers were allowed to work in the U.S. Virgin Islands, annually required temporary foreign workers and were permitted to employ such temporary workers on a recurring basis. The *Rogers* Court noted that after Congressional hearings on the use of the H-2 temporary foreign guestworker program in 1954, Congress expressed disapproval of an initial interpretation of the H-2 temporary program statutory authorization. For a short time the INS did not allow use of the H-2 program for the jobs that "were considered to be recurring and seasonal in nature." *Rogers,* 563 F.2d at 624, citing extensively to a special Congressional study, Subcommittee on Immigration, Citizenship and International Law of the House Committee on the Judiciary, 94th Cong. 1st Sess., Nonimmigrant Alien Labor Program on the Virgin Islands of the United States (Comm. Print 1975), *Rogers*, 563 F.2d at 624.

67.     Describing the plight of U.S. employers that had become dependent on the regular return of workers from other non-U.S. islands to alleviate the serious shortages of workers in their resort and hotel businesses, the *Rogers* Court explained:

> In 1954, a Special House Subcommittee held hearings and studied this problem.  Concluding that the Service's interpretation of the word "temporary" was too restrictive, the Subcommittee recommended a more realistic and expeditious application of the H-2 provisions for natives of the island of Tortola in the British Virgin Islands.  This application of H-2 subsequently was expanded to other Caribbean Islands and other occupations were brought within the expanded construction of the INA.

*Rogers*, 563 F.2d 624, *citing* Comm. Print 1975 at 14-15.

68.     In subsequent years both the INS and now the DHS/USCIS have recognized that it is appropriate to allow "recurring" annual authorizations for U.S. employers to employ temporary or seasonal alien guestworkers under the H-2B program.

69.     At least one petition of Plaintiff Amigos was nonetheless denied by the INS/USCIS because of the legally erroneous basis for denial, that in connection with having made a second consecutive year petition for authorization to employ H-2B landscape workers in Cincinnati, Ohio, the employer might be "becoming dependent" on annually using the H-2B program to assist in meeting its workforce needs.   Thus, the adjudicator concluded the employer's petition should be denied on that legally erroneous ground.   Other petitions have suffered the same treatment for the same illegal reason, that the employer has a recurring annual need.

70.     This reason for denial of an H-2B petition or delay in issuing visa authorization is legally incorrect as demonstrated by review of the underlying statutory authorization, the prior and current regulations governing the issuance of visas for temporary nonagricultural and

agricultural worker employment, and commentary issued by DHS itself in the Federal Register and on its website and in court cases.

71.      The joint DHS/DOL H-2B Interim Final Regulations adopted April 29, 2015, demonstrate that employers with either peakload or seasonal needs may use the H-2B program to meet their temporary workforce needs on an annual recurring basis and furthermore demonstrate that in light of the 2016 Congressional appropriations restriction, the agencies may not restrict annual periods of temporary foreign guestworker employment to nine (9) or fewer months.  That conclusion is required based on the agencies joint explanation for their planned, but now forbidden, maximum recurring need restriction in any 12 month period for which H-2B certification and visa issuance would be authorized.  In the publication of their Interim Final Regulation, as they were describing the reduction in the maximum permitted period from 10 months to 9 months, DHS and DOL said:

> DOL's temporary need period [of 9 months] falls comfortably within the parameters of the general "1 year or less" limitation contained in the DHS regulations.  Routinely allowing employers to file seasonal, peakload or intermittent need applications for periods approaching a year would be inconsistent with the statutory requirements that H-2B job opportunities need to be temporary.  In our experience, the closer the period of employment is to 1 year in the H-2B program, the more the opportunity resembles a permanent position.  We conclude that a maximum period of 9 months establishes the temporariness of the position.  Where there are only a few days or even a month or 2 for which no work is required, the job becomes less distinguishable from a permanent position, particularly one that offers time off due to a slow-down in work activity.  *Recurring temporary needs of more than 9 months* are, as a practical matter, permanent positions for which H-2B labor certification is not appropriate.  The approach in the 2008 rule that permitted temporary certifications for periods up to 10 months encompasses job opportunities that we conclude are permanent in nature and inconsistent with congressional intent to limit H-2B visas to employers with temporary or seasonal needs.  We conclude that the 9-month limitation that fairly describes the maximum scope of a seasonal need should also be applied to

> peakload need since there is no compelling rationale for creating a
> different standard for peakload.

80 Fed. Reg. at 24,056 (first column) (Emphasis supplied).

72.     There can be no doubt that the DHS and DOL expressly considered that H-2B

employers may have recurring annual needs for H-2B guestworkers.   Emphasizing that both

Departments together had expressly considered whether H-2B employers may have recurring

annual needs, 80 Fed. Reg. at 24,056 (first and middle columns), then they said:

> DOL has determined that 9 months better reflects a recurring
> seasonal or temporary need and [the Departments] have
> accordingly adopted a *new standard* in this interim final rule.

80 Fed. Reg. at 24,056 (middle column) (Emphasis supplied).

73.     Indeed, they also recognized that H-2B employers often have "recurring seasonal

or temporary needs" in their claimed justification that relatively few H-2B employers would be

adversely affected by this change saying:

> The majority of H-2B applicants will not be affected by this
> change.  According to DOL H-2B program data for FY 2010-2014,
> 65.2% of certified and partially certified employer applicants had a
> duration of temporary need less than or equal to 9 months.

*Id.* at 24,056 (middle column).

74.     Specifically in describing the recurring, annual needs of peakload need

employers, the Departments continued:

> Similarly, we have determined that limiting to 9 months the
> duration of temporary need on a peakload basis would ensure that
> the employer is not mischaracterizing a permanent need as one that
> is temporary.  For example, since temporary need on a peakload
> basis is not tied to a season [although as explicitly recognized in 8
> C.F.R. § 214.2(h)(6)(ii)(B)(3), it may be tied to a season] under the
> current 10-month standard [that Congress in December 2015
> insisted on maintaining for fiscal year 2016 despite the
> Departments' adopting of a 9-month standard in the April 29, 2015
> promulgated regulations] an employer may be able to characterize

a permanent need for the service or labor by filing consecutive applications for workers on a peakload basis. To the extent that each application does not exceed 10 months, the 2 month inactivity period may correspond to a temporary reduction in workforce due to annual vacations or administrative periods. Increasing the duration of time during which an employer must discontinue operations from 2 months to 3 will ensure that the program is reserved for employers with a genuine temporary need.

80 Fed. Reg. at 24,056 (middle column).

75. An irrational, illegally restrictive, and sometimes inconsistently applied "principle" has developed among some USCIS adjudicators so that if an employer maintains a regular year-round workforce that, for example, never performs a warm-weather task associated with plants but in the winter only performs tasks such as clearing snow, it is recognized as engaged in a "seasonal business" during warmer months when outdoor plants are "touched." These employers are recognized as having a seasonal need during warm months. Other adjudicators view an employer having anyone on the payroll year round who ever touches an outdoor plant or picks up a fallen tree limb in the winter as employing workers engaged in a year round job rather than a "temporary" or other "seasonal" job even if the employer must vastly expand its workforce for a period during each annual period of 12 months. If the unlucky or non-mind reading Agent or employer has marked the "seasonal box" on the USCIS I-129 form instead of the "peakload box" on the I-129 form, the employer's H-2B petition for visa approval to bring in three, four or five times as many guestworkers on to its workforce for a "temporary" period of nine or ten months in the spring, summer and fall is denied even though documentation submitted by the Agent and employer clearly shows that the employer's need for the vastly expanded workforce is a peakload need, "temporary in nature and recurring each year" for up to nine or possibly as many as ten months.

76.    Rejecting an employer's H-2B petition because it has marked the "wrong box" even though the documentation submitted to USCIS through tax returns, payroll records showing weekly payroll amounts paid to laborers in the occupations to be filled by the H-2B workers as well as to other employees in the employer's workforce to show the annual cyclical highs and lows of the employer's workforce needs over 12 months and reflect and prove a surge of employment headcount in the laborer positions, such as landscape maintenance worker to be filled partly by H-2B guestworkers only during warm months, is arbitrary and unreasonable. Despite the seeming clarity of the applicable regulations, especially in light of the Federal Register commentary on the subject, USCIS adjudicators have sown confusion among the regulated community as to what the terms "*peakload need*" and "*seasonal need*" actually mean to USCIS adjudicators.    Delaying or saying certification will be denied if the wrong box has been checked even though the documentation re-establishes the temporary need that OFLC has already recognized as proven but meeting the 15-day period within which USCIS must act to be able to say it has taken an action on the petition within 15 days of receipt of a petition, as required under the rules governing the handling of petitions filed with the extra One Thousand Two Hundred Twenty-Five Dollars ($1,225) for "premium processing" of the petition is unreasonable, arbitrary and capricious.

77.    In DOL guidance documents issued before the now current DHS regulations became effective, DOL had noted that applying the then current DHS regulations at 8 C.F.R. § 214.2(h)(6)(ii) "*[A]n employer's seasonal or peakload need of longer than 10 months, which is of a recurring nature*, will not be accepted." 72 Fed. Reg. 38,621, 38,622 (July 13, 2007) (third column) (Emphasis supplied).  Necessarily, then a recurring seasonal or peakload need *would be* authorized. At that time, as now, the definitions of "seasonal need" and "peakload need" remain

the same under DHS rules, showing that under both DOL and DHS's then long-accepted

guidance and requirements, an employer may indeed have a recurring seasonal or peakload need

and remain eligible to participate in the H-2B program.

78.   When DHS proposed the now-current DHS regulations at 73 Fed. Reg. 49,109-

49,122 (Aug. 20, 2008), it again recognized that employers may use the H-2B program for

recurring annual needs and said:

> U.S. employers in seasonal and certain other industries have, in the
> past, faced a shortage of U.S. workers who are able, willing, and
> qualified to fill temporary non-agricultural jobs, and who would be
> available at the time and place needed to perform the work. *To
> meet this need U.S. employers have turned to hiring foreign
> workers.* One avenue open to such employers is to petition for
> foreign workers who qualify within the H-2B nonimmigrant
> classification. [Citations to the Immigration and Nationality Act
> are omitted.] According to the DOL Employment and Training
> administration, *the top three occupations for which U.S. employers
> utilize the H-2B program are landscape laborers, housekeeping
> cleaners, and construction workers.*

73 Fed. Reg. at 49,109 (Aug. 20, 2008) (third column) (Emphasis supplied).

79.   Even then, DHS recognized that such employers' needs may be seasonal or

peakload, recurring on an annual basis, such as in outdoor landscaping work where the ability

and need to perform outside work on plants, planting annual plants and maintenance of grounds,

shrubs and other plant life in most parts of the U.S. is tied to a certain time of the year – spring,

summer and fall – by a predictable event or pattern (such as the absence of snow, ice and

freezing weather and the resurgence of dormant plant life) and requires labor far above those

necessary for ongoing operations."  73 Fed. Reg. at 49,110 (middle column).

80.   DHS further explained that having a defined "seasonal need" or annual cycle can

result in a "peakload need" in landscaping operations in parts of the country where weather, as

documented by weather records and business record evidence show an annual period when such

work is vastly reduced or even discontinued. 73 Fed. Reg. at 49,110 (middle column).  While saying on the one hand that such temporary workers "may not become a part of the petitioner's regular operations, in the same paragraph DHS acknowledged—expressly said—it would allow recurring annual eligibility to use the H-2B Program where the "peakload" is also "tied to" a "*seasonal need or other recurring* need" "that is tied to a certain time of year by a predictable pattern."  *Id. (*Emphasis supplied).

81.     In further explaining what it meant by stating that the need for "temporary" services or labor must be for a "limited period of time," DHS noted that the term "limited period of time" is in turn defined as a period of need that will end in the near, definable future.  73 Fed. Reg. at 49,115 (first column).

82.     Continuing to explain the current DHS regulations that govern USCIS actions, DHS said it would generally consider a period of temporary need to be limited to one year or less . . . except in the case of a one-time need such as for construction workers on a lengthy more than year-long project.  73 Fed. Reg. at 49,115.

83.     When DHS adopted its now-current H-2B regulations on December 19, 2008, the provisions defining "peakload need" and "seasonal need" remained the same as they were previously and are now.  *See* 73 Fed. Reg. 78,104, 78,129 (Dec. 19, 2008) (middle column) codified at 8 C.F.R. § 214.2(h)(6)(ii)(B).

84.     In further recognizing that many H-2B employers annually require the services of temporary employees, DHS noted that in many ways the H-2B program is similar to the H-2A program for agricultural employees and employers but as in the case of construction workers covers a broader spectrum of industries that have needs beyond those of typical "agricultural growing season[s]."  73 Fed. Reg. at 78,119.  Clearly, someone at DHS recognizes that most

outdoor plants in most parts of the United States have an annual growing cycle that results in periods when few or no workers are required.

85.     DHS and DOL regulations currently in effect make it clear that H-2B employers legitimately may have annually recurring needs for temporary workers.  Denying any H-2B employer's petition or even issuing a Request for Evidence because the employer has come to rely annually on the availability of temporary foreign workers to meet any "temporary need for labor or services" whether the need be a "seasonal" workforce need or a "peakload" workforce need, as those terms are properly defined, is unreasonable and contrary to applicable legal requirements, including those under 8 U.S.C. § 1101(a)(15)(H)(ii)(b) and the provisions of the Administrative Procedure Act as well as the regulations and explanations of its own regulations by USCIS..

86.     Some of the Plaintiff Agents' employers have received petition denials for USCIS because they have asked for a period of visa approval for up to ten (10) months during a consecutive annual period in violation of the restrictions on the USCIS that were imposed in Section 113 of the 2016 Appropriations Act.

87.     Congress has declared that the USCIS may not limit annual recurring needs to nine (9) or fewer months on a consecutive basis.  In the Consolidated Appropriations Act, 2016, Pub. L. 114-113, § 113 Congress said:

> Further, for the purpose of regulation admission of temporary workers under the H-2B program, the definition of temporary need shall be that provided in 8 C.F.R. 214.2(h)(6)(ii)(B).

88.     Under the incorporated 8 C.F.R. § 214.2(h)(6)(ii)(B), DHS expressly states that "[E]mployment is of a temporary nature when the employer needs a worker for a limited period of time . . . .  Generally, that period of time will be limited to one year or less, but in the case of a one-time that could last up to three years.

**COMPLAINT FOR INJUNCTIVE AND DECLATORY RELIEF**
**AND PETITION FOR ISSUANCE OF WRIT OF MANDAMUS - Page 49**

89.     In so specifying Congress recognized the eligibility of H-2B employers that require full or partial H-2B workforces on a recurring, annual basis when it passed the budget for 2016.  In so doing, Congress also expressly rejected a nine (9) month regulatory limitation on the annual period an employer may employ an H-2B worker.  The maximum annual employment period DHS and the DOL, acting jointly, had adopted in Interim Final Regulations was to have been nine (9) months.  80 Fed. Reg. at 24,113 (first and middle columns) to be codified as 20 C.F.R. § 655.6(b).  *See also* 80 Fed. Reg. at 24,056.  These IFRs had been adopted on a claimed emergency basis without notice and comment rulemaking and without employer input.  (*See* 80 Fed. Reg. 24,042-24,144) (April 29, 2015).

90.     Furthermore, when Joint DHS and DOL published the April 29, 2015 Joint Regulations, some provisions of which Congress blocked in the 2016 Appropriations Authorization, DHS along with DOL discussed the ability of a job contracting or staffing company to use the H-2B program to meet temporary workforce needs.  They said that a job contracting or staffing company has limited ability to use the H-2B program if it supplies workers to multiple employers on an essentially a year round basis.  Nonetheless, they said that even such a staffing company can be eligible to use the H-2B program to provide workers to clients.  DHS acknowledged that "a job contractor that regularly supplies workers for ski resorts from October to March but does not supply any workers performing the same services or labor needed by the ski resorts outside of those months would qualify as having a temporary need that is seasonal for such workers," again demonstrating the recognition by DHS that H-2B employers can have an annual recurring need for particular jobs to be performed for particular periods of time each year or on an up to ten (10)  consecutive month basis in a period stretching over two calendar years.  80 Fed. Reg. at 24,055 (middle column).

91.     Also in the April 29, 2015 joint publication of the agencies' joint rule on requirements for DOL review of H-2B applications, they recognized that annual needs for temporary workers for at least nine (9) months are appropriate for H-2B certification even though they wanted to reduce the annual recurring period to nine (9) months from the then existing ten (10) month maximum.  As the agencies there said after discussing the treatment of the 1-time occurrence that may last for a period of up to three years, the other categories of "temporary need" would henceforth be limited to periods of nine (9) months, "a decrease from the 10-month duration under DOL's 2008 rule."  80 Fed. Reg. at 24,055 (third column), *citing also* 8 C.F.R. § 214.2(h)(6)(ii)(B).  This planned nine (9) month limit in annual periods of temporary need later was rejected in the 2016 Appropriations Act.

92.     The DOL, OFLC, and their officials have likewise failed and continue to fail to meet statutory and regulatory duties, and their failures continue and continue to cause irreparable damages.  In the jointly issued regulations governing the application of H-2B employers to DOL's OFLC for issuance of a labor certification the employers must then submit with their petitions to the DHS component agency, the USCIS, employers and OFLC are subject to strict timelines within which actions must be taken.  All actions must be completed by employers and their agents, DOL/OFLC and the USCIS in a very compressed time, especially considering that each application and petition filed by an employer may seek authorization for temporary employment of guestworkers for only a limited time, at most only 9 or now 10 months again except for 1-time occurrence situations.  Many H-2B employers do employ H-2B guestworkers for nine (9) or even ten (10) months during each 12-month period and cannot operate without them.  Employers only make these filings because the employers expect to be unable and thus far

have been unable to obtain hiring acceptances from an adequate number of U.S. workers to fill their temporary staffing needs.

93.     In a drastic and predictably catastrophic change from DOL/OFLC's prior application filing process under which employers and their agents could file their applications as many as 120 days in advance of the employer's date of needing the workers in place in the U.S. and at work, under the jointly issued new procedures *an employer may submit a completed Application for Temporary Employment Certification no more than "90 calendar days. . . before the employer's date of need"*.   20 C.F.R. §655.15(d), 80 Fed. Reg. at 24,059, 24,115. (Emphasis supplied.) When employers could submit their labor certification applications up to 120 days before their date of need, if DOL's OFLC met its deadlines for its actions as imposed by DOL's regulations, there was more time after DOL/OFLC issued the labor certification and delivered it to the employer and its agent by overnight delivery for USCIS and then the Consular offices to complete their parts of the process.   Knowing each part of the process was time-consuming, employers hastened to submit their petitions as soon as possible and paid the premium processing fee of $1,225 in reliance on obtaining their visa authorizations within 15 days after submitting their petitions so they and their proposed H-2B employees could move on to the actual visa issuance processes of the Department of State.

94.     Under the regulations currently in effect for DOL/OFLC processing, there is theoretically an "emergency process" whereby the certifying officer of DOL's OFLC "may waive the time period(s) for filing an *H-2B Registration (that now must be submitted in advance of any application under ordinary circumstances) and/or Application for Temporary Employment Certification* for employers that have good and substantial cause, provided the CO has sufficient time to thoroughly test the domestic labor market on an expedited basis and to

make a final determination as required by § 655.50.  80 Fed. Reg. at 24,116, to be codified as 20 C.F.R. § 655.17(a).  Plaintiff Agents and their employer clients have worked hard and urgently to use this "emergency" process, but OFLC's backlog of H-2B (and now H-2A agricultural applications) is still far behind and getting worse as its agency officials have admitted.  *See* Exhibit 12, pp. 167-169, 173, 176-178, 241-242.

95.     The current OFLC regulations, like those these replaced, require that any Notice sent by the OFLC certifying officer that requires a response must be mailed to the address provided by the proposed H-2B employer "using means to insure next day delivery."  Now such delivery may be made by electronic mail.  The employer's response to such a notice or request must be mailed using methods to assure next day delivery, including electronic mail.  80 Fed. Reg. 24,122, to be published as 20 C.F.R. § 655.30.

96.     The jointly published DHS/DOL OFLC regulations further provide that if the OFLC certifying officer determines that an employer's Application ". . . and/or job order is incomplete, contains errors or inaccuracies or does not meet the requirements set forth in this subpart," the certifying officer must notify the employer "within 7 business days from the CO's receipt of the Application. . . ."  80 Fed. Reg. at 21,122, to be codified as 20 C.F.R. § 655.31(a).  Among other requirements, such notice issued by the CO must state that reasons the Application or job order fails to meet criteria for acceptance and must state any modification needed for the CO to issue a Notice of Acceptance of the application.  The CO must offer the employer the opportunity to submit a modified Application within ten (10) business days of the Notice of Deficiency.  While the Notice of Deficiency must offer the proposed H-2B employer an opportunity to obtain administrative review of the Notice of Deficiency before an Administrative Law Judge of the Department of Labor, 80 Fed. Reg. at 24,122 (third column), to be codified as

20 C.F.R. § 655.31(b) filing an appeal would be an act of futility, given the compressed time within which all H-2B certification application, petition for visa authorization, and actual individual worker visa issuances must occur within the short 90 day period that is the earliest date employers may now apply to DOL/OFLC to start the certification process.  Even then, workers must actually travel to the workplace in order to be on-the-job.

97.     Turning again to the DOL/OFLC application for certification, if modifications to the application are required and are made timely, the certifying officer will issue a Notice of Acceptance of the application ("NOA").  80 Fed. Reg. 24,122-24,123, to be published as 20 C.F.R. § 655.32.  Once the Notice of Acceptance is finally issued, the employer may begin its formal recruitment of U.S. potential workers and must complete recruitment procedures before the employer and its agent submit the employer's recruitment report as required so that the labor certification will finally be issued by DOL//OFLC.  80 Fed. Reg. at 24,124, to be codified as 20 C.F.R. § 655.40(b).

98.     By regulation, the CO must issue an NOA within a seven (7) day period after the Application and Job Order are complete and meet requirements of  what is to be codified as 20 C.F.R. Part 655, Subpart A, that pertains to the H-2B DOL certification process.  80 Fed. Reg. at 24,123 (first column), to be codified as 20 C.F.R. § 655.33. "[T]he CO will notify the employer in writing within seven (7) business days from the date the CO received the Application…and Job Order or modification thereof."   80 Fed. Reg. at 24,123 (first column), to be codified at 20 C.F.R. §655.33(a).

99.     Contrary to these regulatory requirements for action by DOL, the Plaintiff Agents and their employer clients have not received Notices of Acceptance or Notices of Deficiency within the seven (7) day required period.  Indeed, as shown by the attached Exhibits 1 through 11

demonstrating delays in which DOL and OFLC have engaged, in many instances H-2B employers and their agents have no knowledge of the status of their long pending Applications and job orders. Timeliness of DOL and OFLC actions is critical because an H-2B employer and its agent must file the approved labor certification with the USCIS in connection with the employer's petition for authorization for the issuance of the H-2B visas it needs so the employer or agent can then schedule an appointment time for the prospective worker to be interviewed by a Consular officer so the actual visas can be issued to individual workers.   The regulations require that once a temporary laborer certification is granted, the CO must send the approved certification and final determination letter to the employer and its agent, if there is one, by means normally assuring next day delivery, including electronic mail.  80 Fed. Reg. at 24,126 (first column), to be codified at 20 C.F.R. § 655.52.

100.   As was true under previously issued DOL/OFLC regulations, the DOL/OFLC may conduct audits of previously issued temporary employment certification applications to determine an employer's compliance with H-2B legal obligations as provided under regulations. It may refer findings and underlying documentation collected to DHS, to DOL's Wage and Hour Division or to "other appropriate enforcement agencies."  80 Fed. Reg. at 24,128, to be codified at 20 C.F.R. § 655.70(d).

101.   To meet statutory and due process requirements, all the processes of DOL/OFLC and DHS/USCIS must provide an effective means by which employers can both meet all governmental filing requirements *and also* obtain their certifications and visa authorizations in time to allow needed temporary workers to obtain their individual visas and arrive at the employers' job sites on time by their employers' dates of need.  These agencies have failed to accomplish this obligation.  The Plaintiff Agents and their employer clients have begged officials

of their agencies to find solutions to the problems, and they have apprised Defendant officials of improper and unlawful demands being made by their subordinate staff certifying officers in DOL/OFLC and adjudicators in DHS/USCIS. The attached correspondence between attorney Wendel Hall directed to OFLC Service Center Director Kathy Baran is indicative of the attention paid by these Defendants to the urgent requests for oversight being requested by and on behalf of H-2B employers in light of the mounting and unresolved delays, improper agency actions and injuries caused by their failures of attention attached as Exhibit 12, pp. 234-240. See also the attached correspondence between Veronica Birkenstock, President of Practical Employee Solutions, and Brian Pasternak, Deputy Director of the DOL/OFLC attached as Exhibit 12, p. 167, and other correspondence such as that on pages 165-166, 174-175, 234-240, 241-242, 248-261.

102.   No court or lawful authority has directed USCIS to delay, stop or suspend premium processing of petitions for which all of these agent's employers have paid but for which they have not received promised benefits of such payments by prompt processing by USCIS. In the past weeks, for those employers for which the Agents have obtained issuances of OFLC "certifications," they have filed visa petitions by overnight courier deliveries or electronic means but in many instances the agents and employers have not even received notification by USCIS that their petitions have been received. In many cases, where petitions have been acknowledged as received, USCIS adjudicators have issued Requests for Evidence or Notices of Intent to Deny based on grounds that are not permitted under DHS's own regulations. DHS Defendants have allowed USDIC adjudicators to issue Requests for Evidence to which the employers and their agents must respond. They have thereby incurred delays and expenses on grounds that are not legally permitted and that are contrary to applicable DHS/USCIS regulatory requirements, the

2016 Congressional Appropriations Act restrictions on such agency requirements, or both. Because of delays by both DOL/OFLC and DHS/USCIS staff under the direction of these agency Defendants, Plaintiffs' employer clients who needed seasonal or other temporary workers in January, February and March and who are still subject to pending Application and petitions are already far behind in their work, some of which cannot now be performed and for which they will forever have lost revenues as well as good will.  Others need their workers as of April 1, now an impossibility for most as a practical matter. They too will be unable to meet their contractual obligations to clients and will not be able to conduct regular business operations for which they and their U.S. employees rely on the availability of these H-2B workers to perform expected work demands in hotels, inns, resorts and restaurants, for landscaping customers and for others for which there is expected business demand but for which there are no formal contracts in existence.  With respect to services the H-2B employers have contracted to provide and with respect to business services of an ordinary nature the employers have held themselves available to perform, each that cannot perform services for which it has contracted or normally provides to the public will suffer irreparable damages and losses financially and to their reputations.  Each H-2B prospective employer and all of the Plaintiff Agents have invested substantial sums of money in conducting their businesses in preparation for the temporary period now passing without workers or just days ahead during which they had expected to earn their major revenue for the year.  They have spent unrecoverable money, time, and effort applying for the authorizations requested through the DOL and DHS.  These businesses are at risk of failure. The jobs at risk include those of their U.S. employees who also depend on the timely services of the needed H-2B workers who are not on the job and, as things stand, not going to be on the job.

103.    USCIS procedures specify that USCIS will adjudicate an employer's petition filed with an approved OFLC labor certification within 15 calendar days of the filing of the petition when the employer pays an extra One Thousand Two Hundred Two-Five Dollars ($1,225.00) for "premium processing." See Pub. L. 106-553, 114 Stat 2762 (Dec 21, 2000); INA 286(u), 8 U.S.C. § 1356(u); 8 C.F.R §§ 103.2(f), 103.7(b)(1), (c)(1); 66 Fed. Reg. 29,682-86 (June 1, 2001). USCIS must refund the extra premium processing fee if action is not taken within these 15 calendar days, but the mandatory 15 day processing deadline is met if USCIS issues an Approval, a Request for Evidence, a Notice of Intent to Deny, or a Denial Notice within 15 calendar days of receipt or if the case is referred for investigation or suspected fraud or misrepresentation." DHS/USCIS *Instructions for Premium Processing Service*, USCIS 9-07, OMB No. 1615-0048, under "When should I use Form I-907", page 1, paragraph 5. USCIS has not in good faith met requirements for processing properly filed, duly DOL/OFLC certified petitions for visa issuance authorizations.

104.    Other than demonstrating by its actions that it has reserved the right to consider DOL/OFLC determinations on such matters as the adequacy of the showing by the employer that the requested positions are "temporary" and that such determinations by DOL/OFLC are only advisory and subject *de novo* investigation and adjudication by USCIS, another reason USCIS may be issuing such an unprecedented number of Requests for Evidence and Notices of Intent to Deny—including many that make demands USCIS may not legally make, is to comply formally with its 15 day action requirement. Plaintiffs Exhibits show their respective comparisons in the numbers of Requests for Evidence by USCIS in 2016 as compared to the past. Perhaps that is also the reason so many RFE's are issued that contain a different "target" employer name within them than the "addressee" employer and why some adjudicators have asked for a supposedly

necessary form ETA-750, the use of which was discontinued by DOL upon the effective date of DOL/OFLC's regulations governing the H-2B program published in December 2008. 73 Fed. Reg. at 78,051 (Dec. 19, 2008).

105.    Whatever the reason for the extraordinary delays of visa adjudication in which DHS/USCIS is engaged, these delays are not authorized by the INA, as amended by IRCA and have the practical effect of thwarting entirely the ability of H-2B employers to use the H-2B program in a meaningful and reliable way, thereby denying them entirely the benefit of Congressionally approved process by which they may employ legal temporary guestworkers.

106.    **Practical Employee Solution**s has initiated multiple inquiries to USCIS and OFLC by telephone, mail and attempted personal contact about the status of its clients' pending DOL/OFLC applications and pending DHS/USCIS petitions.

107.    **Amigos Labor Solutions, Inc.** has initiated multiple inquiries to USCIS and OFLC by telephone, mail and attempted personal contact about the status of its clients' pending the DOL/OFLC applications and pending DHS/USCIS petitions.

108.    **International Labor Consultants Co, Ltd**. has initiated multiple inquiries to USCIS and OFLC by telephone, mail and attempted personal contact about the status of its clients' pending the DOL/OFLC applications and pending DHS/USCIS petitions.

109.    **Mas Labor H2B, LLC** has initiated multiple inquiries to USCIS and OFLC by telephone, mail and attempted personal contact about the status of its clients' pending the DOL/OFLC applications and pending DHS/USCIS petitions.

110.    Because of the lack of sufficient numbers of able, willing and qualified US workers to staff their seasonal or other temporary work obligations, Plaintiffs' H-2B employer clients are already or will be unable to fulfill their contractual obligations to clients in 2016.

Their dire circumstances worsen if they do not immediately obtain H-2B workers to fulfill contractual work obligations and also to hold open their doors for regular business, as they have done in past years, expecting reasonably comparable levels of new and repeat business opportunities in 2016. Employers that needed their temporary workforce in January or February are already suffering irreparable financial losses and reputational injuries and other serious injuries and lost business opportunities. For example, a refractory business in Fort Worth, Texas, had to turn down a work opportunity amounting to $750,000 in revenues and "high bid" another job because it needed H-2B workers to perform the work. The unavailability of those H-2B workers also means jobs that would have been held by Americans are lost. See Exhibit 12, pp. 31-32. Plaintiff Agents, their clients and all of their respective employees will suffer from the collapse of these businesses that are dependent on the timely availability of H-2B guestworkers, to the extent that U.S. workers are not available to perform these jobs. Litzenburger Landscape in a small town in Michigan has announced that after 31 years of business it is shutting down, effective immediately, because needed H-2B workers on whom it has relied are not available because of DOL/OFLC delays. Before Litzenburger Landscape quit waiting and hoping, it had waited 78 days for the first DOL/OFLC step that under regulations should have happened within 7 business days. Plaintiff Agents and their employer clients will suffer millions of dollars in unrecoverable damages, besides the collapse of many of these businesses that provide employment to U.S. workers, some of them in jobs for which H-2B workers are needed to supplement the U.S. workforce and enable the U.S. workers to have an employment opportunity. Other U.S. workers in management, sales, administrative and other jobs for which H-2B workers are not needed but whose jobs are dependent on the availability of

H-2B workers are to perform the projects to be undertaken by these businesses are also at risk of losing their jobs.

111.    If Plaintiff Agents cannot obtain the issuances of the OFLC labor Certifications and petition approvals for their respective H-2B clients, each will suffer a loss of business reputation that is irreparable, as will their client employers.  Plaintiff Agents and their respective H-2B employer clients and their customers' clients will lose confidence in the reasonable and reliable operation of their H-2B government programs that Congress designed to enable U.S. employers, facing a temporary workforce shortage, to hire legally authorized workers. Plaintiff Agents and their employer clients have each invested substantial sums of money in earning and maintaining their respective reputations for reliability and in preparation for their seasons that should have already started or should begin April 1, 2016.  Within a short temporary window, these business must earn most, and in some cases all, of the revenue they will receive for the year.

112.    As another example, Plaintiff Agent Practical Employee Solutions' employer client Bio Landscape and Maintenance, Inc., dba Yellow Stone Landscape ("Bio") will begin its 2016 season already "behind" and not meeting its contractual obligations as a result of H-2B workers not arriving on time to begin work on April 1, as its President Timothy J. Portland testifies in his Declarations that are attached as Exhibit 12, pp. 1-17 and 243-247.

113.    a.    "Beginning April 1, we will be behind in meeting our contractual obligations. We will be attempting to perform work that was to have been performed by the 138 H-2B workers we have worked so hard and spent so much time and money to obtain legally through other Bio personnel who will be working on an overtime basis at a cost to the company

of more than $80,000 PER WEEK in overtime wages.  We cannot recoup those overtime wages from our clients or the agency that has caused these losses.

114.    b.    Beginning April 1, BIO will begin suffering significant inefficiencies in crew routing, rescheduling of customer services, crew fatigue, excessive managerial hours, and other inefficiencies from massive overwork of our existing workforce in the already chaotic ramp-up of our peak season of high customer demands.    A 15% reduction in overall productivity, which is our best estimate given the loss of 138 working positions, results in an additional $35,000 PER WEEK in expenses that Bio will begin incurring.

115.    c.    Beyond the pure financial costs, we are further concerned about fatigue among our domestic workforce, the safety impact of these extra working hours on our workforce and the long term impact of any safety incidents on our safety rating and insurance costs while at the same time realizing if we fail to keep existing customers at least reasonably satisfied, we will not have a business that needs workers.

116.    d.    Further, as customer schedules are compromised, rescheduled, pushed into evening and weekend hours, etc., our customers will experience meaningful dis-satisfaction, and some will cancel their contracts.  Bio works and competes hard to win new customer contracts and harder to maintain them.  We pride ourselves on our service standards and meeting customer requirements.  Those efforts resulted in a Trailing Twelve Month Retention Rate of nearly 90% of the contractual revenue we had one year ago.   Therefore, losing a customer because of these un-necessary labor shortages further costs Bio the lost margin on each such contract for an average of nearly 9 of the next 10 years.   The potential loss of a single $10,000 per month customer contract, at a 25% contribution margin (before fixed overhead expenses), for 9 years, would be $270,000 in lost value.

117. e.  Lastly, despite making commitments to shareholders, lenders and even employees on growth targets (not to mention customer retention aspirations we and our employees have worked hard to maintain), without the personnel to execute our existing contracts and obligations, Bio will need to dial back on what new opportunities it bids and proposes, sacrificing growth both short term, and suffering the compounding adverse financial and reputational effects over the long term."

118.  Because the Plaintiff Agents' employer clients, including these employer-clients, have not obtained certifications issued by DOL/OFLC and visa authorizations issued by DHS/USCIS in a timely manner, or at all, each of these companies is already suffering financial and reputational harm and will continue to suffer such irreparable, financial and reputational harms because of the acts and omissions of these federal agencies and their officials who are responsible for the operation of the H-2B Program.  The only mitigation of these terrible losses can come through an injunction and the issuance of a *writ of mandamus* requiring immediate attention to issuance of the held up labor certifications and authorizations by USCIS for the issuance of visas so that affected H-2B employers and their agents can make arrangements for expected H-2B employees to present themselves at a U.S. Consulate in their home countries to be interviewed so that their individual workers' visas finally can be issued and they can begin their journeys to the job worksites of their proposed employers who need them so urgently.

119.  Plaintiffs and their respective employer-clients will be unable to recover compensation from the government Defendants and their respective officials for the harms caused by their unreasonable delays and refusals to act.

## <u>FIRST CAUSE OF ACTION</u>

### Violation of the Administrative Procedure Act,
### 5 U.S.C. §§ 551 *et seq*., 701 *et seq*.

120.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-114 of the Complaint as if fully set forth herein.

121.    The failure by DOL/OFLC and DHS/USCIS and their responsible officials to act upon their timely-filed applications for certification and adjudicate and approve the petitions filed by Plaintiffs and their respective employer-clients that were filed in accordance with all applicable statutory and regulatory requirements are agency actions pursuant to the Administrative Procedure Act.  5 U.S.C. § 551(13).

122.    The failures by DOL/OFLC and DHS/USCIS and their responsible officials to act upon Plaintiffs' and their client employers' timely-filed applications for certification and adjudicate and approve Plaintiffs' employer clients' petitions, that were filed in accordance with all applicable, required statutory and regulatory requirements are arbitrary and capricious actions, are agency actions unlawfully withheld or unreasonably delayed, or are otherwise not in accordance with law, all in violation of the Administrative Procedure Act.  5 U.S.C. § 701 *et seq.*

123.    The actions by both DOL/OFLC and DHS/USCIS and their responsible officials of sending out Requests for Modification of Applications filed with OFLC that are not justified by reason, regulation or common sense and of similar actions by USCIS in issuing Requests for Evidence, Notices of Intent to Deny and Denials that are not justified by reason, regulation or common sense, are arbitrary and capricious actions, are agency actions unlawfully withheld or unreasonably delayed, or are otherwise not in accordance with law, all in violation of the Administrative Procedure Act.  5 U.S.C. § 701 *et seq.*

124.    The refusals of DOL/OFLC and its officers to adhere to the deadlines in the Joint DHS/DOL H-2B Regulations by which the labor certifications should be been issued, and

DHS/USCIS and its officers to adjudicate and approve petitions filed on behalf of Plaintiffs' employer-clients using "premium processing" time limits and only legally permissible requirements are arbitrary and capricious actions, are agency actions unlawfully withheld or unreasonably delayed, or are otherwise not in accordance with law, all in violation of the Administrative Procedure Act.  5 U.S.C. § 701 *et seq.*  The actions of these agencies and their officers of claiming that businesses that have engaged in seasonal operations or operations that require expanded workforces to meet "peakload" temporary needs for many years must prove their seasonal or other temporary need are likewise violative of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* The determinations of USCIS adjudicators that H-2B employers may not have annual, recurring needs for H-2B workers is an unlawful restriction on the use of the H-2B program in violation of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

## SECOND CAUSE OF ACTION

### Violation of the Takings Clause of the
### Fifth Amendment to the United States Constitution

125.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-118 of the Complaint as if fully set forth herein.

126.    The failures of DOL/OFLC and DHS/USCIS and their respective officers and agents to review and approve applications for certification and to adjudicate and approve petitions filed by Plaintiffs on behalf of their employer-clients, all of which meet the statutory and regulatory standards for certification or approval of visa petitions has deprived Plaintiffs and their employer-clients of benefits to which they are otherwise entitled without due process of law.  These actions constitute a taking of private property without just compensation in violation of the Fifth Amendment to the United States Constitution.   The denial of H-2B visas to

employers that have come to rely on the annual use of the H-2B temporary worker program to provide their staff or to supplement their regular staffs is likewise such an unlawful taking.

### THIRD CAUSE OF ACTION

### Declaration Pursuant to the Declaratory Judgment Act

127.    Plaintiffs re-allege and incorporates by reference the allegations of Paragraphs 1-121 of the Complaint as if fully set forth herein.

128.    There is actual controversy of sufficient immediacy and concreteness related to Plaintiffs' legal rights, such that relief is warranted under 28 U.S.C. §§ 2201, 2202.

129.    The harms Plaintiffs and their employer clients have already experienced and will experience as a result of the actions, delayed actions, and failures to act of the agency Defendants and their respective officials is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and related injunctive relief.

### PRAYER FOR RELIEF

For the reasons set forth in this Complaint, Plaintiffs request relief from the Court as follows, noting that as soon as appropriate papers can be prepared they will seek an immediate injunction and the issuance of a *writ of mandamus* against all of the Defendants to achieve urgently needed relief to which the Plaintiffs and their employer clients are entitled that includes an Order that:

1.  The Certifying Officer of the Office of Foreign Labor Certification immediately issue and deliver by email transmission, hard copy by next day delivery, labor certifications in connection with all applications for H-2B certification filed by the Plaintiff Agents for their employer clients or filed by their employer clients that seek H-2B certifications, both still pending and those denied within the past 75 days.

2. The Director of the USCIS or his subordinate officials in charge of the California, and Vermont USCIS Service Centers, respectively Kathy Baran and Laura Zuchowski, immediately issue and deliver by next day delivery authorizations for the issuances of all H-2B visas for which Plaintiff Agents or their employer clients have petitioned, both those that are pending and those that have been denied within the past 75 days.

3. That Plaintiffs be awarded their costs in pursing this action as provided in 28 U.S.C. § 2412, as well as their reasonable attorneys' fees in accordance with the requirements of the Equal Access to Justice Act. 5 U.S.C. § 504 because the acts and omissions of the Defendants were not substantially justified and there are no special circumstances that make such an award unjust.

4. And such other relief as this Honorable Court may grant them.

Respectfully submitted, this 24th day of March, 2016.

/s/ Arthur V. Lambert
Arthur V. Lambert
Attorney-in-Charge
Texas Bar No. 11841250
alambert@laborlawyers.com
FISHER & PHILLIPS, LLP
500 N. Akard Street, Suite 3550
Dallas, Texas 75201
PH: (214) 220-9100
FX: (214)220-9122

**COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2016, the foregoing pleading was delivered to Tami C.

Parker, Esquire via email at Tami.Parker@usdoj.gov and shall be delivered in hard copy via

overnight delivery to:

> Tami C. Parker, Esquire
> Assistant United States Attorney
> Deputy Civil Chief, Fort Worth Division
> United States Attorney's Office
> 801 Cherry Street
> Unit 4
> Suite 1700
> Fort Worth, Texas 76102

>   /s/ Arthur V. Lambert
> Arthur V. Lambert